Rehearing en banc granted, August 22, 2007

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ALI SALEH KAHLAH AL-MARRI,
              *Petitioner-Appellant,*

              and

MARK A. BERMAN, as next friend,
              *Petitioner,*

              v.

COMMANDER S. L. WRIGHT, USN
Commander, Consolidated Naval
Brig,
              *Respondent-Appellee.*

SPECIALISTS IN THE LAW OF WAR;
PROFESSORS OF EVIDENCE AND
PROCEDURE; UNITED STATES CRIMINAL
SCHOLARS AND HISTORIANS; FORMER
SENIOR JUSTICE DEPARTMENT
OFFICIALS; CENTER FOR NATIONAL
SECURITY STUDIES; AMERICAN-ARAB
ANTI-DISCRIMINATION COMMITTEE;
ASIAN-AMERICAN JUSTICE CENTER;
NATIONAL IMMIGRANT JUSTICE
CENTER; HUMAN RIGHTS FIRST;
HUMAN RIGHTS WATCH;
PROFESSORS OF CONSTITUTIONAL
LAW AND FEDERAL JURISDICTION;
HATE FREE ZONE; MUSLIM
ADVOCATES; WORLD
ORGANIZATION FOR HUMAN RIGHTS
USA,
              *Amici Supporting Appellant.*

No. 06-7427

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Henry F. Floyd, District Judge.
(2:04-cv-002257-HFF)

Argued: February 1, 2007

Decided: June 11, 2007

Before MOTZ and GREGORY, Circuit Judges, and
Henry E. HUDSON, United States District Judge for the
Eastern District of Virginia, sitting by designation.

---

Reversed and remanded by published opinion. Judge Motz wrote the
opinion, in which Judge Gregory joined. Judge Hudson wrote a dis-
senting opinion.

---

## COUNSEL

**ARGUED:** Jonathan L. Hafetz, BRENNAN CENTER FOR JUS-
TICE, New York University School of Law, New York, New York,
for Appellant. David B. Salmons, Assistant to the Solicitor General,
UNITED STATES DEPARTMENT OF JUSTICE, Office of the
Solicitor General, Washington, D.C., for Appellee. **ON BRIEF:**
Andrew J. Savage, III, SAVAGE & SAVAGE, P.A., Charleston,
South Carolina; Lawrence S. Lustberg, Mark A. Berman, GIBBONS,
DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, P.C., Newark,
New Jersey, for Appellant. Paul D. Clement, Solicitor General, Regi-
nald I. Lloyd, United States Attorney, District of South Carolina,
Gregory G. Garre, Deputy Solicitor General, Kevin F. McDonald,
Assistant United States Attorney, Claire J. Evans, UNITED STATES
DEPARTMENT OF JUSTICE, Criminal Division, Appellate Section,
Washington, D.C., for Appellee. Jenny S. Martinez, Stanford, Califor-
nia; Allison Marston Danner, Nashville, Tennessee; Valerie M. Wag-
ner, Daniel B. Epstein, DECHERT, L.L.P., Palo Alto, California, for
Specialists in the Law of War, Amicus Supporting Appellant. Jona-

than M. Freiman, NATIONAL LITIGATION PROJECT of the Allard K. Lowenstein International Human Rights Clinic, Yale Law School, New Haven, Connecticut, for Professors of Evidence and Procedure, Amicus Supporting Appellant. Hope R. Metcalf, WIGGIN AND DANA, L.L.P., New Haven, Connecticut, for United States Criminal Scholars and Historians, Amicus Supporting Appellant. James C. Schroeder, Gary A. Isaac, Heather M. Lewis, MAYER, BROWN, ROWE & MAW, L.L.P., Chicago, Illinois, for Former Senior Justice Department Officials, Amicus Supporting Appellant. Kate Martin, Joseph Onek, CENTER FOR NATIONAL SECURITY STUDIES, Washington, D.C., Paul Smith, Joshua A. Block, JENNER & BLOCK, L.L.P., New York, New York, for Center for National Security Studies, Amicus Supporting Appellant; Lema Bashir, AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE, Washington, D.C., for American-Arab Anti-Discrimination Committee, Amicus Supporting Appellant; Aimee J. Baldillo, ASIAN AMERICAN JUSTICE CENTER, Washington, D.C., for Asian-American Justice Center, Amicus Supporting Appellant; Mary Meg McCarthy, Tara Magner, NATIONAL IMMIGRANT JUSTICE CENTER, Chicago, Illinois, for National Immigrant Justice Center, Amicus Supporting Appellant. Gabor Rona, Hina Shamsi, HUMAN RIGHTS FIRST, New York, New York; Jennifer Daskal, HUMAN RIGHTS WATCH, Washington, D.C.; Donald Francis Donovan, Catherine M. Amirfar, Tali Farimah Farhadian, DEBEVOISE & PLIMPTON, L.L.P., New York, New York, for Human Rights First and Human Rights Watch, Amici Supporting Appellant. Gerald L. Neuman, Cambridge, Massachusetts; Harold Hongju Koh, New Haven, Connecticut; Sarah H. Cleveland, Cambridge, Massachusetts; Margaret L. Sanner, REED SMITH, L.L.P., Richmond, Virginia, for Professors of Constitutional Law and Federal Jurisdiction, Amicus Supporting Appellant. Timothy J. Finn, Julia E. McEvoy, Katherine E. Stern, JONES DAY, Washington, D.C., for National Association of Criminal Defense Lawyers, Amicus Supporting Appellant. Shankar Narayan, HATE FREE ZONE, Seattle, Washington, for Hate Free Zone, Amicus Supporting Appellant; Farhana Khera, MUSLIM ADVOCATES, Kensington, Maryland, for Muslim Advocates, Amicus Supporting Appellant. Morton Sklar, Executive Director, Joseph Husty, Legal Intern, WORLD ORGANIZATION FOR HUMAN RIGHTS USA, Washington, D.C., with the assistance of

Law Student Contributors: Melissa Keyes (U. of CA at Hastings Law School), Charles Wait, Aaron Clark-Rizzio, Kennon Scott, Binish Hasan, Maria Tennyson, Olivia Maginley and Meredith Angelson (New York Univ. Law Sch.), Simon Moshenberg, Jesse Townsend, Stephanie Hays, Sameer Ahmed and Nicholas Pederson (Yale Law School), Matt Sadler (B.C. Law School), for World Organization for Human Rights USA, Amicus Supporting Appellant. David H. Remes, Enrique Armijo, John F. Coyle, COVINGTON & BURLING, L.L.P., Washington, D.C., for David M. Brahms, Brigadier General, Donald J. Guter, Rear Admiral, Merrill A. McPeak, Retired General, Amici Supporting Appellant.

---

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

For over two centuries of growth and struggle, peace and war, the Constitution has secured our freedom through the guarantee that, in the United States, no one will be deprived of liberty without due process of law. Yet more than four years ago military authorities seized an alien lawfully residing here. He has been held by the military ever since — without criminal charge or process. He has been so held despite the fact that he was initially taken from his home in Peoria, Illinois by civilian authorities, and indicted for purported domestic crimes. He has been so held although the Government has never alleged that he is a member of any nation's military, has fought along-side any nation's armed forces, or has borne arms against the United States anywhere in the world. And he has been so held, without acknowledgment of the protection afforded by the Constitution, solely because the Executive believes that his military detention is proper.

While criminal proceedings were underway against Ali Saleh Kahlah al-Marri, the President ordered the military to seize and detain him indefinitely as an enemy combatant. Since that order, issued in June of 2003, al-Marri has been imprisoned without charge in a military jail in South Carolina. Al-Marri petitions for a writ of habeas corpus to secure his release from military imprisonment. The Government defends this detention, asserting that al-Marri associated

with al Qaeda and "prepar[ed] for acts of international terrorism." It maintains that the President has both statutory and inherent constitutional authority to subject al-Marri to indefinite military detention and, in any event, that a new statute — enacted years after al-Marri's seizure — strips federal courts of jurisdiction even to consider this habeas petition.

We hold that the new statute does not apply to al-Marri, and so we retain jurisdiction to consider his petition. Furthermore, we conclude that we must grant al-Marri habeas relief. Even assuming the truth of the Government's allegations, the President lacks power to order the military to seize and indefinitely detain al-Marri. If the Government accurately describes al-Marri's conduct, he has committed grave crimes. But we have found no authority for holding that the evidence offered by the Government affords a basis for treating al-Marri as an enemy combatant, or as anything other than a civilian.

This does not mean that al-Marri must be set free. Like others accused of terrorist activity in this country, from the Oklahoma City bombers to the surviving conspirator of the September 11th attacks, al-Marri can be returned to civilian prosecutors, tried on criminal charges, and, if convicted, punished severely. But the Government cannot subject al-Marri to indefinite military detention. For in the United States, the military cannot seize and imprison civilians — let alone imprison them indefinitely.

I.

Al-Marri, a citizen of Qatar, lawfully entered the United States with his wife and children on September 10, 2001, to pursue a master's degree at Bradley University in Peoria, Illinois, where he had obtained a bachelor's degree in 1991. The following day, terrorists hijacked four commercial airliners and used them to kill and inflict grievous injury on thousands of Americans. Three months later, on December 12, 2001, FBI agents arrested al-Marri at his home in Peoria as a material witness in the Government's investigation of the September 11th attacks. Al-Marri was imprisoned in civilian jails in Peoria and then New York City.

In February 2002, al-Marri was charged in the Southern District of New York with the possession of unauthorized or counterfeit credit-

card numbers with the intent to defraud. A year later, in January 2003, he was charged in a second, six-count indictment, with two counts of making a false statement to the FBI, three counts of making a false statement on a bank application, and one count of using another person's identification for the purpose of influencing the action of a federally insured financial institution. Al-Marri pleaded not guilty to all of these charges. In May 2003, a federal district court in New York dismissed the charges against al-Marri for lack of venue.

The Government then returned al-Marri to Peoria and he was re-indicted in the Central District of Illinois on the same seven counts, to which he again pleaded not guilty. The district court set a July 21, 2003 trial date. On Friday, June 20, 2003, the court scheduled a hearing on pre-trial motions, including a motion to suppress evidence against al-Marri assertedly obtained by torture. On the following Monday, June 23, before that hearing could be held, the Government moved *ex parte* to dismiss the indictment based on an order signed that morning by the President.

In the order, President George W. Bush stated that he "DETERMINE[D] for the United States of America that" al-Marri: (1) is an enemy combatant; (2) is closely associated with al Qaeda; (3) "engaged in conduct that constituted hostile and war-like acts, including conduct in preparation for acts of international terrorism;" (4) "possesses intelligence . . . that . . . would aid U.S. efforts to prevent attacks by al Qaeda;" and (5) "represents a continuing, present, and grave danger to the national security of the United States." The President determined that al-Marri's detention by the military was "necessary to prevent him from aiding al Qaeda" and thus ordered the Attorney General to surrender al-Marri to the Secretary of Defense, and the Secretary of Defense to "detain him as an enemy combatant."

The federal district court in Illinois granted the Government's motion to dismiss the criminal indictment against al-Marri. In accordance with the President's order, al-Marri was then transferred to military custody and brought to the Naval Consolidated Brig in South Carolina.

Since that time (that is, for four years) the military has held al-Marri as an enemy combatant, without charge and without any indica-

tion when this confinement will end. For the first sixteen months of his military confinement, the Government did not permit al-Marri any communication with the outside world, including his attorneys, his wife, or his children. He alleges that he was denied basic necessities, interrogated through measures creating extreme sensory deprivation, and threatened with violence. A pending civil action challenges the "inhuman, degrading" and "abusive" conditions of his confinement. *See* Complaint at 1, *Al-Marri v. Rumsfeld*, No. 2:05-cv-02259-HFF-RSC (D.S.C. Aug. 8, 2005).

On July 8, 2003, counsel for al-Marri petitioned on his behalf (because it was undisputed that he was unavailable to petition) for a writ of habeas corpus in the Central District of Illinois. The district court dismissed the petition for lack of venue, *Al-Marri v. Bush*, 274 F. Supp. 2d 1003 (C.D. Ill. 2003); the Seventh Circuit affirmed, *Al-Marri v. Rumsfeld*, 360 F.3d 707 (7th Cir. 2004); and the Supreme Court denied certiorari, *al-Marri v. Rumsfeld*, 543 U.S. 809 (2004). On July 8, 2004, al-Marri's counsel filed the present habeas petition on al-Marri's behalf in the District of South Carolina. On September 9, 2004, the Government answered al-Marri's petition, citing the Declaration of Jeffrey N. Rapp, Director of the Joint Intelligence Task Force for Combating Terrorism, as support for the President's order to detain al-Marri as an enemy combatant.

The Rapp Declaration asserts that al-Marri: (1) is "closely associated with al Qaeda, an international terrorist organization with which the United States is at war"; (2) trained at an al Qaeda terrorist training camp in Afghanistan sometime between 1996 and 1998; (3) in the summer of 2001, was introduced to Osama Bin Laden by Khalid Shaykh Muhammed; (4) at that time, volunteered for a "martyr mission" on behalf of al Qaeda; (5) was ordered to enter the United States sometime before September 11, 2001, to serve as a "sleeper agent" to facilitate terrorist activities and explore disrupting this country's financial system through computer hacking; (6) in the summer of 2001, met with terrorist financier Mustafa Ahmed Al-Hawsawi, who gave al-Marri money, including funds to buy a laptop; (7) gathered technical information about poisonous chemicals on his laptop; (8) undertook efforts to obtain false identification, credit cards, and banking information, including stolen credit card numbers; (9) communicated with known terrorists, including Khalid Shaykh Muhammed

and Al-Hawsawi, by phone and e-mail; and (10) saved information about jihad, the September 11th attacks, and Bin Laden on his laptop computer.

The Rapp Declaration does *not* assert that al-Marri: (1) is a citizen, or affiliate of the armed forces, of any nation at war with the United States; (2) was seized on or near a battlefield on which the armed forces of the United States or its allies were engaged in combat; (3) was ever in Afghanistan during the armed conflict between the United States and the Taliban there; or (4) directly participated in any hostilities against United States or allied armed forces.

On October 14, 2004, the Government permitted al-Marri access to his counsel for the first time since his initial confinement as an enemy combatant sixteen months before. Al-Marri then submitted a reply to the Government's evidence, contending that he is not an enemy combatant; he then moved for summary judgment. The district court denied the summary judgment motion and referred the case to a magistrate judge for consideration of the appropriate process to be afforded al-Marri in light of *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). The magistrate judge ruled that the Rapp Declaration provided al-Marri with sufficient notice of the basis of his detention as an enemy combatant and directed al-Marri to file rebuttal evidence.

In response to the magistrate's ruling, al-Marri again denied the Government's allegations, but filed no rebuttal evidence, contending that the Government had an initial burden to produce evidence that he was an enemy combatant and that the Rapp Declaration did not suffice. The magistrate judge recommended dismissal of al-Marri's habeas petition because al-Marri had failed to rebut the allegations in the Rapp Declaration. In August 2006, the district court adopted the magistrate judge's report and recommendation and dismissed al-Marri's habeas petition. A few days later, al-Marri noted this appeal.[1]

---

[1]Numerous amici have submitted briefs to us, both on the jurisdictional and merits questions. Many of these briefs have been helpful and we are especially grateful for the care exhibited in focusing on different issues, thus avoiding redundancy.

## II.

On November 13, 2006, three months after al-Marri noted his appeal, the Government moved to dismiss this case for lack of jurisdiction, citing section 7 of the recently enacted Military Commissions Act of 2006 (MCA), Pub. L. No. 109-366, 120 Stat. 2600.

### A.

Section 7 of the MCA amends 28 U.S.C. § 2241(e) — a provision Congress added to the federal habeas corpus statute in the Detainee Treatment Act of 2005 (DTA), Pub. L. No. 109-148, § 1005(e)(1), 119 Stat. 2680, 2741-42. Congress enacted the DTA in response to the Supreme Court's holding, in *Rasul v. Bush*, 542 U.S. 466, 475-84, (2004), that the federal habeas corpus statute, 28 U.S.C. § 2241(a), (c), granted the federal courts jurisdiction over habeas petitions filed by aliens held at Guantanamo Bay.

In the DTA, Congress amended 28 U.S.C. § 2241 by adding a new subsection, 2241(e), which removed the statutory grant of federal jurisdiction over actions filed by alien enemy combatants held at Guantanamo Bay. DTA § 1005(e)(1). Through the DTA, Congress sought to replace the procedures that *Rasul* had upheld with a substitute remedy. In place of the statutory right to petition for habeas directly to a federal district court in § 2241(a), Guantanamo Bay detainees would receive a Combatant Status Review Tribunal (CSRT) conducted "pursuant to applicable procedures specified by the Secretary of Defense," followed by review by the United States Court of Appeals for the District of Columbia Circuit. *See* DTA § 1005(e)(2)(A),(B); *id.* § 1005(a).

The Supreme Court considered the reach of the DTA in *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2762-69 (2006). It held that the DTA did not divest the federal courts of jurisdiction over § 2241 habeas actions filed by Guantanamo Bay detainees that were *pending* when the DTA was enacted in December 2005.

On October 17, 2006, in response to *Hamdan*, Congress enacted the MCA, in part to clarify that it wished to remove § 2241 jurisdic-

tion over pending and future habeas cases from detainees whom it believed had only a "*statutory* right of habeas." *See, e.g.*, 152 Cong. Rec. S10267 (daily ed. Sept. 27, 2006) (statement of Sen. Graham) (emphasis added). Thus, section 7 of the MCA replaces the habeas provision added by the DTA and substitutes the following:

> (e)(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is await-ing such determination.

> (2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the [DTA], no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confine-ment of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

MCA § 7(a) (codified at 28 U.S.C.A. § 2241(e) (West 2006)). The new statute expressly provides that this amendment to § 2241(e) "shall take effect on the date of the enactment of this Act [October 17, 2006], and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act . . . ." MCA § 7(b).

B.

The Government asserts that the MCA divests federal courts of all subject matter jurisdiction over al-Marri's petition. Al-Marri main-tains that the MCA, by its plain terms, does not apply to him and that if we were to hold it does, the MCA would be unconstitutional.

Al-Marri's constitutional claim is a serious one. As an alien cap-tured and detained within the United States, he has a right to habeas corpus protected by the Constitution's Suspension Clause. *See Hamdi*

*v. Rumsfeld*, 542 U.S. 507, 525 (2004) ("All agree that, absent suspension, the writ of habeas corpus remains available to every individual detained within the United States."). The Supreme Court has explained that "at the absolute minimum, the Suspension Clause protects the writ as it existed in 1789," *INS v. St. Cyr*, 533 U.S. 289, 301 (2001) (internal quotation marks omitted), and "[a]t common law, courts exercised habeas jurisdiction over the claims of aliens detained within sovereign territory of the realm," *Rasul*, 542 U.S. at 481.

Al-Marri argues persuasively that the MCA, which simply amended a federal statute — 28 U.S.C. § 2241 — is not, and could not be, a valid exercise of Congress's powers under the Suspension Clause. *See, e.g.*, *Hamdan*, 126 S. Ct. at 2764; *St. Cyr*, 533 U.S. at 298-99. Moreover, although Congress may remove federal jurisdiction over habeas petitions without suspending the writ *if* it provides an "adequate and effective" substitute, *Swain v. Pressley*, 430 U.S. 372, 381 (1977), al-Marri maintains that Congress has provided him no substitute at all. Thus, he argues, if the MCA is read to strip our jurisdiction over his petition, it violates the Suspension Clause.

The Government seems to concede that al-Marri has a right to habeas corpus protected by the Suspension Clause, and acknowledges that "the touchstone of habeas corpus," and thus any substitute remedy, is "[j]udicial review of constitutional claims and questions of law." The Government asserts, however, that Congress has provided al-Marri a constitutionally adequate habeas substitute through the DTA and MCA scheme — an administrative determination by a CSRT followed by limited review of the CSRT's decision in the D.C. Circuit. Since al-Marri has never been afforded a CSRT and neither the DTA, the MCA, nor any other statute, regulation, or policy guarantees that he be granted one, it is not immediately apparent how this statutory arrangement could provide al-Marri a substitute remedy. Al-Marri has also raised substantial questions as to whether this statutory arrangement — were it available to him — would be constitutionally adequate. *Cf. Boumediene v. Bush*, 476 F.3d 981, 1004-07 (D.C. Cir. 2007) (Rogers, J., dissenting) (stating that a CSRT followed by limited D.C. Circuit review is not an adequate habeas substitute), *cert. denied*, 127 S. Ct. 1478 (2007).

We need not, however, resolve these difficult constitutional questions because we conclude that the MCA does not apply to al-Marri.

The Supreme Court has instructed that when it is "fairly possible" to read a statute to avoid serious constitutional problems a court must do so. *Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." (internal quotation marks omitted)); *see also St. Cyr*, 533 U.S. at 299-300 (applying this principle in the context of habeas jurisdiction). In this case, ordinary principles of statutory interpretation demonstrate that the MCA does not apply to al-Marri.

C.

As always in interpreting an act of Congress, we begin with the plain language of the statute. *See, e.g.*, *Watt v. Alaska*, 451 U.S. 259, 265 (1981). The MCA eliminates habeas jurisdiction under § 2241 only for an alien who "has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination." MCA § 7(a). Thus, the MCA does not apply to al-Marri and the Government's jurisdictional argument fails *unless* al-Marri (1) "has been determined by the United States to have been properly detained as an enemy combatant," or (2) "is awaiting such determination."

The Government asserts that al-Marri "has been determined by the United States to have been properly detained" through the President's order of June 23, 2003, designating al-Marri an enemy combatant. Alternatively, the Government argues that because the Department of Defense claims that if this court dismisses his habeas action al-Marri will be provided with a CSRT, al-Marri is "awaiting" such a determination for the purposes of the MCA. We find neither argument persuasive.

1.

In his order of June 23, 2003, the President "DETERMINE[D] for the United States of America that" al-Marri was an enemy combatant

and ordered al-Marri detained by the Department of Defense. This Presidential order may well constitute a "determination" by the President, for the United States, that al-Marri *is* an enemy combatant. But the plain language of the MCA requires more than this initial determination to divest federal courts of jurisdiction under § 2241. The statute does not eliminate § 2241 jurisdiction in cases filed by an alien whom "the United States has determined is an enemy combatant" *or* who "has been detained as an enemy combatant." Rather the MCA only eliminates § 2241 jurisdiction over a habeas petition filed by an alien who "*has been determined* by the United States *to have been properly detained* as an enemy combatant" (emphasis added).

The statute's use of the phrase "has been determined . . . to have been properly detained" requires a two-step process to remove § 2241 jurisdiction: (1) an initial decision to detain, followed by (2) a determination by the United States that the initial detention was proper. The President's June 23 order only constitutes an initial decision to detain. To read the statute as the Government proposes would eliminate the second step and render the statutory language "has been determined . . . to have been properly detained" superfluous — something courts are loathe to do. *See, e.g.*, *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.").

Other provisions of the DTA and MCA similarly demonstrate that Congress intended to remove jurisdiction only in cases in which the Government followed this two-step process. For those detainees to whom the DTA-MCA scheme applies, a CSRT (or similar tribunal) determines whether a person's initial detention as an enemy combatant is proper. In fact, Congress recognized that the very purpose of a CSRT is to "determine" whether an individual has been "properly detained." Thus, Congress delineated some basic procedural requirements for the CSRTs, *see* DTA § 1005, and required the Secretary of Defense to submit to it within 180 days "the procedures of the Combatant Status Review Tribunals . . . that are in operation at Guantanamo Bay, Cuba, for *determining the status of the detainees*." DTA § 1005(a)(1)(A) (emphasis added). The Department of Defense's CSRT procedures, in turn, explain that the CSRT process was established "to *determine*, in a fact-based proceeding, whether the individ-

uals *detained* by the Department of Defense at the U.S. Naval Base Guantanamo Bay, Cuba, are *properly* classified as enemy combatants." Memorandum from Deputy Secretary of Defense Gordon England to Secretaries of the Military Departments et al. 1 (July 14, 2006) [hereinafter CSRT Procedures Memorandum] (emphasis added).

Moreover, the DTA and MCA provisions establishing D.C. Circuit review of CSRT final decisions are entitled "Review of decisions of combatant status review tribunals of *propriety of detention*." *See* DTA § 1005(e)(2); MCA § 10 (emphasis added). These provisions allow for D.C. Circuit review only of a final decision of a "Combatant Status Review Tribunal that an alien is *properly detained* as an enemy combatant." DTA § 1005(e)(2)(A) (emphasis added). These procedures reinforce the plain language of section 7 of the MCA. Congress intended to remove federal courts' § 2241 jurisdiction only when an individual has been detained *and* a CSRT (or similar Executive Branch tribunal) has made a subsequent determination that the detention is proper.[2]

---

[2]For these reasons, the Government's brief suggestion that the district court's denial of habeas relief to al-Marri could constitute the determination "by the United States" that he had "been properly detained" is inconsistent with legislative intent. For under the system Congress enacted, a CSRT or similar *Executive Branch* tribunal makes that determination "by the United States." Indeed, the Government has informed the federal courts of precisely this point in other litigation involving the MCA. *See* Government's Supplemental Br. Addressing the Military Commissions Act at 6 n.1, *Boumediene*, 476 F.3d 981 (D.C. Cir. 2007) (Nos. 05-5062, 05-5063, 05-5064, and 05-5095 through 05-5116) (noting that "[t]he United States, through the CSRTs, has determined that petitioners are 'properly detained' as enemy combatants" under the MCA). And, of course, the Government has repeatedly and vehemently asserted that the Executive Branch, not the Judiciary, determines a person's enemy combatant status. *See, e.g.*, *Hamdi*, 542 U.S. 507. Moreover, the very purpose of section 7 of the MCA is to eliminate the jurisdiction of federal judges over certain enemy combatant cases. Hence, adoption of the Government's argument would mean that Congress empowered federal judges to make a "determination [for] the United States" in the very cases in which those judges had no jurisdiction. Congress could not have intended such a result.

Thus, the plain language of the MCA does not permit the Government's interpretation — i.e., that the President's initial order to detain al-Marri as an enemy combatant constitutes *both* a decision to detain al-Marri *and* a determination under the MCA that al-Marri *has been* properly detained as an enemy combatant. The MCA requires both to eliminate our jurisdiction.

2.

The Government's remaining jurisdictional contention is that even if al-Marri has not yet "been determined by the United States to have been properly detained," the Government plans to provide him with a CSRT in the future, and so under the MCA he is "awaiting such determination." Al-Marri maintains that Congress intended the term "awaiting such determination" to apply only to new detainees brought to Guantanamo Bay, or to those captured and held elsewhere outside the United States, and that the Government reads the term far more broadly than Congress intended.

Neither the DTA-MCA nor any other law or policy requires that al-Marri receive a CSRT, or even indicates that Congress believed he would be eligible for a CSRT and so could be "awaiting" one. At the same time, Congress did not expressly prohibit al-Marri from receiving a CSRT. To the extent that the plain language of the MCA does not clearly state who is "awaiting" a determination, its context and legislative history make clear that this phrase does not apply to persons, like al-Marri, captured and held within the United States. *See, e.g.*, *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("[A] cardinal rule [is] that a statute is to be read as a whole . . . since the meaning of statutory language, plain or not, depends on context." (citation omitted)); *Crandon v. United States*, 494 U.S. 152, 158 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.").

In enacting the MCA, Congress distinguished between those individuals it believed to have a *constitutional* right to habeas corpus, and those individuals it understood had been extended the right of habeas corpus only by *statute*, i.e., 28 U.S.C. § 2241. The supporters of the MCA consciously tracked the distinction the Supreme Court had

drawn in *Johnson v. Eisentrager*, 339 U.S. 763, 777-78 (1950), and
*United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990),
between aliens within the United States who become "'invested with
the rights guaranteed by the Constitution to all people within our bor-
ders,'" *Verdugo-Urquidez*, 494 U.S. at 271 (*quoting Kwong Hai Chew
v. Colding*, 344 U.S. 590, 596 n.5 (1953)), and aliens who have no
lawful contacts with this country and are captured and held outside its
sovereign territory. *See, e.g.*, 152 Cong. Rec. S10268 (daily ed. Sept.
27, 2006) (statement of Sen. Kyl); 152 Cong. Rec. S10406-07 (daily
ed. Sept. 28, 2006) (statement of Sen. Sessions).

   Congress sought to eliminate the statutory grant of habeas jurisdic-
tion for those aliens captured and held outside the United States who
could not lay claim to constitutional protections, but to preserve the
rights of aliens like al-Marri, lawfully residing within the country
with substantial, voluntary connections to the United States, for
whom Congress recognized that the Constitution protected the writ of
habeas corpus. As the Chairman of the House Judiciary Committee
and floor manager for the MCA in the House explained, "There are
two types of habeas corpus: one is the constitutional great writ. We
are not talking about that here . . . . The other is statutory habeas cor-
pus, which has been redefined time and time again by the Congress.
That is what we are talking about here . . . ." 152 Cong. Rec. H7548
(daily ed. Sept. 27, 2006) (statement of Rep. Sensenbrenner); *see also*
H.R. Rep. No. 109-664, pt. 2, at 5-6 (2006) (noting that "aliens
receive constitutional protections when they have come within the ter-
ritory of the United States and developed substantial connections with
this country" and that the MCA "clarifies the intent of Congress that
statutory habeas corpus relief is not available to alien unlawful enemy
combatants held outside of the United States" (internal quotation
marks omitted)).

   In fact, notwithstanding its posture in this case,[3] the Government

---

   [3]Consistent with its litigation strategy, the Government briefly sug-
gests that al-Marri "is on the same footing as alien enemy combatants at
Guantanamo" because the DTA does not provide Guantanamo detainees
with "a statutory right to a CSRT." This contention misses the mark.
First, Congress knew when it enacted the MCA that the Executive had

has otherwise demonstrated that it shares this understanding of the scope of the MCA. On January 18, 2007, while al-Marri's appeal was pending, the Attorney General himself testified before Congress that the MCA did *not* affect any habeas rights historically protected by the Constitution. Citing *Eisentrager* in written testimony to the Senate Judiciary Committee, he explained: "The MCA's restrictions on habeas corpus petitions did not represent any break from the past. Indeed, it has been well-established since World War II that enemy combatants *captured abroad* have no constitutional right to habeas petitions in the United States courts." *Oversight of the U.S. Dep't of Justice: Hearing Before the S. Comm. on the Judiciary*, 110th Cong. (Jan. 18, 2007) (statement of Alberto Gonzales, Att'y Gen. of the United States) (emphasis added).

---

already provided CSRTs to all Guantanamo Bay detainees, and that the CSRT procedures — which Congress required be provided to it, DTA § 1005(a)(1)(A) — were designed to apply only to Guantanamo detainees. In contrast, when Congress enacted the MCA on October 17, 2006, the Government had never indicated any intention to convene a CSRT for anyone like al-Marri, captured and held within the United States. Moreover, and just as importantly, although Congress believed that the Guantanamo detainees had no constitutional right to habeas corpus, and so believed it had no constitutional need to provide them a statutory alternative, Congress recognized that aliens captured and held within the United States did have a constitutional right to habeas. If Congress had intended to provide an adequate substitute for the constitutional protections of aliens within the United States, surely it would have enacted legislation to do so.

For these same reasons, the Government's attempt to find significance in the MCA's removal of the DTA's limiting references to "Guantanamo Bay, Cuba" is also misplaced. In fact, that change merely allowed the MCA to apply to aliens captured and held in other places outside the United States, for example in Iraq and Afghanistan, *see, e.g.*, 152 Cong. Rec. S10267 (daily ed. Sept. 27, 2006) (statement of Sen. Graham), and made clear in the face of public discussion about closing Guantanamo Bay that the rights of detainees moved from Guantanamo would not change. Even the Government ultimately concedes that the "amendment may have been designed to underscore the absence of habeas for aliens detained abroad at locations other than Guantanamo, as opposed to aliens detained in the United States."

Furthermore, the Government's treatment of al-Marri suggests that, despite its litigation posture, it does not actually believe that the CSRT process in the DTA and MCA applies to al-Marri. In the four years since the President ordered al-Marri detained as an enemy combatant, the Government has completed CSRTs for each of the more than five hundred detainees held at Guantanamo Bay. Yet it was not until November 13, 2006, the very day the Government filed its motion to dismiss the case at hand, that the Government even suggested that al-Marri might be given a CSRT. At that time the Government proffered a memorandum from Deputy Secretary of Defense Gordon England directing that al-Marri be provided a CSRT "upon dismissal" of this case. This memorandum is too little too late.

The CSRT procedures, which the England memorandum suggests would govern al-Marri's hypothetical tribunal, by their own terms only apply to aliens detained "at the Guantanamo Bay Naval Base, Cuba." CSRT Procedures Memorandum, Enclosure (1), at 1. Moreover, the DTA and MCA provide for limited D.C. Circuit review only to detainees for whom a CSRT "has been conducted, pursuant to *applicable procedures* specified by the Secretary of Defense." DTA § 1005(e)(2)(B)(ii) (emphasis added); *see* MCA § 10. Because the procedures that would govern al-Marri's hypothetical CSRT are "applicable" only to persons detained at Guantanamo Bay, even were al-Marri to receive a CSRT pursuant to them, he might not be eligible for judicial review.

Given these provisions, the Government's argument that the phrase "awaiting such determination" covers persons confined within the United States yields a strange result. It would mean that Congress assured that Guantanamo Bay detainees were provided with an administrative factfinding process (the CSRT) followed by judicial review in the D.C. Circuit when eliminating habeas jurisdiction over their cases — but that Congress provided neither any substitute administrative procedure nor any form of judicial review when eliminating the habeas rights of those captured and detained within the United States. The Government offers nothing to indicate that Congress embarked on this strange course, and the legislative history of the MCA renders that theory untenable.

Perhaps because the Government knows that Congress did not intend the CSRT process to apply to persons like al-Marri, the

England memorandum neither convenes nor even schedules a CSRT for al-Marri. Indeed, in its motion to dismiss, the Government acknowledges that the England memorandum only indicates "how the government plans to handle al-Marri in the event the courts agree that the MCA divested the courts of jurisdiction." Thus, the England memorandum makes al-Marri's CSRT at best conditional — triggered only "in the event" that we dismiss this litigation. In other words, the memorandum says only that al-Marri might receive a CSRT if this court dismisses his petition because he is awaiting a CSRT, but al-Marri will be awaiting a CSRT only if we dismiss his petition.

If al-Marri is "awaiting" a CSRT it is only because he might, through the good graces of the Executive, some day receive one. But he might not. After all, the Government's primary jurisdictional argument in this case is that the President's initial order to detain al-Marri constitutes the sole "determination" that he is due. And so under the Government's view, al-Marri might well be "awaiting" a determination of the propriety of his detention for the rest of his life — a result Congress could not have countenanced for an individual it understood to have a constitutional right to habeas corpus.

In sum, the Government's interpretation of the MCA is not only contrary to legislative intent, but also requires reading the phrase "awaiting such determination" so broadly as to make it meaningless. We are not at liberty to interpret statutes so as to render them meaningless. *See Scott v. United States*, 328 F.3d 132, 139 (4th Cir. 2003) ("[W]e must . . . avoid any interpretation that may render statutory terms meaningless . . . .") (*citing Freytag v. Comm'r Internal Revenue*, 501 U.S. 868, 877 (1991)). The phrase "awaiting such determination" gains meaning only if it refers to alien detainees captured and held outside the United States — whom Congress both believed had no constitutional right to habeas and expected would receive a CSRT based on the larger DTA-MCA scheme. Al-Marri is not such a detainee; therefore he is not "awaiting such determination" within the terms of the MCA.

3.

For these reasons, we must conclude that the MCA does not apply to al-Marri. He was not captured outside the United States, he is not

being held at Guantanamo Bay or elsewhere outside the United States, he has not been afforded a CSRT, he has not been "determined by the United States to have been properly detained as an enemy combatant," and he is not "awaiting such determination." The MCA was not intended to, and does not, apply to aliens like al-Marri, who have legally entered, and are seized while legally residing in, the United States. Accordingly, the Government's jurisdictional argument fails and we turn to the merits of al-Marri's petition.

### III.

Al-Marri premises his habeas claim on the Fifth Amendment's guarantee that no person living in this country can be deprived of liberty without due process of law. He maintains that even if he has committed the acts the Government alleges, he is not a combatant but a civilian protected by our Constitution, and thus is not subject to military detention. Al-Marri acknowledges that the Government can deport him or charge him with a crime, and if he is convicted in a civilian court, imprison him. But he insists that neither the Constitution nor any law permits the Government, on the basis of the evidence it has proffered to date — even assuming all of that evidence is true — to treat him as an enemy combatant and subject him to indefinite military detention, without criminal charge or process.

The Government contends that the district court properly denied habeas relief to al-Marri because the Constitution allows detention of enemy combatants by the military without criminal process, and according to the Government it has proffered evidence that al-Marri is a combatant. The Government argues that the Authorization for Use of Military Force (AUMF), Pub. L. No. 107-40, 115 Stat. 224 (2001), as construed by precedent and considered in conjunction with the "legal background against which [it] was enacted," empowers the President on the basis of that proffered evidence to order al-Marri's indefinite military detention as an enemy combatant. Alternatively, the Government contends that even if the AUMF does not authorize the President to order al-Marri's military detention, the President has "inherent constitutional power" to do so.

### A.

Each party grounds its case on well established legal doctrine. Moreover, important principles guiding our analysis seem undisputed.

Before addressing the conflicting contentions of the parties, we note these fundamental principles, which we take to be common ground.

The Constitution guarantees that no "person" shall "be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V; *see also id.* amend. XIV, § 1. The text of the Fifth Amendment affords this guarantee to "person[s]," not merely citizens, and so the constitutional right to freedom from deprivation of liberty without due process of law extends to all lawfully admitted aliens living within the United States. *See Wong Wing v. United States*, 163 U.S. 228, 238 (1896); *see also Verdugo-Urquidez*, 494 U.S. at 271.

To be sure, our Constitution has no "force in foreign territory unless in respect of our citizens." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936). But, as Chief Justice Rehnquist explained, a long line of Supreme Court cases establish that aliens receive certain protections — including those rights guaranteed by the Due Process Clause — "when they have come within the territory of the United States and developed substantial connections with this country." *Verdugo-Urquidez*, 494 U.S. at 271; *see also Kwong Hai Chew*, 344 U.S. at 596 n.5 (noting that "once an alien lawfully enters and resides in this country he becomes invested with . . . rights . . . protected by . . . the Fifth Amendment[ ] and by the due process clause of the Fourteenth Amendment") (internal quotation marks omitted); *Wong Wing*, 163 U.S. at 238 (holding that "all persons within the territory of the United States are entitled to the protection guaranteed by" the Due Process Clause of the Fifth Amendment); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (explaining that the Due Process Clause of the Fourteenth Amendment protects "all persons within the territorial jurisdiction" of the United States). Thus, the Due Process Clause protects not only citizens but also aliens, like al-Marri, lawfully admitted to this country who have established substantial connections here — in al-Marri's case by residing in Illinois for several months, with his family, and attending university there.[4]

---

[4]Hence, the case at hand involves — and we limit our analysis to — persons seized and detained within the United States who have constitutional rights under the Due Process Clause.

"Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *see also Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). This concept dates back to Magna Carta, which guaranteed that "government would take neither life, liberty, nor property without a trial in accord with the law of the land." *Duncan v. Louisiana*, 391 U.S. 145, 169 (1968) (Black, J., concurring). The "law of the land" at its core provides that "no man's life, liberty or property be forfeited as a punishment until there has been a charge fairly made and fairly tried in a public tribunal." *In re Oliver*, 333 U.S. 257, 278 (1948). Thus, the Supreme Court has recognized that, because of the Due Process Clause, it "may freely be conceded" that as a "'general rule' . . . the government may not detain a person prior to a judgment of guilt in a criminal trial." *United States v. Salerno*, 481 U.S. 739, 749 (1987).

The Court, however, has permitted a limited number of specific exceptions to this general rule. Although some process is always required in order to detain an individual, in special situations detention based on process less than that attendant to a criminal conviction does not violate the Fifth Amendment. *See, e.g.*, *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997) (civil commitment of mentally ill sex offenders); *Salerno*, 481 U.S. 739 (pretrial detention of dangerous adults); *Schall v. Martin*, 467 U.S. 253 (1984) (pretrial detention of dangerous juveniles); *Addington v. Texas*, 441 U.S. 418, 427-28 (1979) (civil commitment of mentally ill); *Humphrey v. Smith*, 336 U.S. 695 (1949) (courts martial of American soldiers). Among these recognized exceptions is the one on which the Government grounds its principal argument in this case: Congress may constitutionally authorize the President to order military detention, without criminal process, of persons who "qualify as 'enemy combatants,'" that is, fit within that particular "legal category." *Hamdi v. Rumsfeld*, 542 U.S. 507, 516, 522 n.1 (2004) (plurality).[5]

---

[5]Case law also establishes that during times of war Congress may constitutionally authorize the President to detain "enemy aliens," also known as "alien enemies," defined as "subject[s] of a foreign state at war with the United States." *Eisentrager*, 339 U.S. at 769 n.2 (internal quotation

The act of depriving a person of the liberty protected by our Constitution is a momentous one; thus, recognized exceptions to criminal process are narrow in scope, and generally permit only limited periods of detention. *See, e.g.*, *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). And, of course, the Government can never invoke an exception, and so detain a person without criminal process, if the individual does not fit within the narrow legal category of persons to whom the exception applies. For example, the Supreme Court has explained that the Constitution does not permit the Government to detain a predatory sex criminal through a civil commitment process simply by establishing that he is dangerous. The civil commitment process may only be substituted for criminal process for such a criminal if the Government's evidence establishes "proof of dangerousness" *and* "proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'" *Hendricks*, 521 U.S. at 358.

In *Hamdi*, the plurality explained that precisely the same principles apply when the Government seeks to detain a person as an enemy combatant. Under the habeas procedure prescribed in *Hamdi*, if the Government asserts an exception to the usual criminal process by detaining as an enemy combatant an individual with constitutional rights, it must proffer evidence to demonstrate that the individual "qualif[ies]" for this exceptional treatment. 542 U.S. at 516, 534. Only *after* the Government has "put[ ] forth credible evidence that" an individual "meets the enemy-combatant criteria" does "the onus" shift to the individual to demonstrate "that he falls outside the [enemy

---

marks omitted); *see Ludecke v. Watkins*, 335 U.S. 160 (1948). And, the Government can detain potentially dangerous resident aliens for a limited time pending deportation. *See, e.g.*, *Carlson v. Landon*, 342 U.S. 524, 537-42 (1952); *cf. Zadvydas v. Davis*, 533 U.S. 678 (2001) (construing a statute's authorization of post-removal-period detention to not permit indefinite detention of aliens, to avoid serious doubt as to its constitutionality). But, as the Government recognizes, the Alien Enemy Act, the statute the Court considered in *Eisentrager* and *Ludecke*, does not apply to al-Marri's case — in fact, al-Marri is not an "enemy alien" but a citizen of Qatar, with which the United States has friendly diplomatic relations; and the Government does not seek to deport al-Marri. Therefore neither of these exceptions is offered by the Government as a basis for holding al-Marri without criminal charge, and neither is applicable here.

combatant] criteria." *Id.* at 534. For in this country, the military cannot seize and indefinitely detain an individual — particularly when the sole process leading to his detention is a determination by the Executive that the detention is necessary[6] — unless the Government demonstrates that he "qualif[ies]" for this extraordinary treatment because he fits within the "legal category" of enemy combatants. *Id.* at 516, 522 n.1.

Moreover, when the Government contends, as it does here, that an individual with constitutional rights is an enemy combatant, whose exclusive opportunity to escape indefinite military detention rests on overcoming presumptively accurate hearsay, courts must take particular care that the Government's allegations demonstrate that the detained individual is not a civilian, but instead, as the Supreme Court has explained, "meets the enemy-combatant criteria." *Id.* at 534. For only such care accords with the "deeply rooted and ancient opposition in this country to the extension of military control over civilians." *Reid v. Covert*, 354 U.S. 1, 33 (1957) (plurality).

These principles thus form the legal framework for consideration of the issues before us. Both parties recognize that it does not violate the Due Process Clause for the President to order the military to seize and detain individuals who "qualify" as enemy combatants for the duration of a war. They disagree, however, as to whether the evidence the Government has proffered, even assuming its accuracy, establishes that al-Marri fits within the "legal category" of enemy combatants. The Government principally contends that its evidence establishes this and therefore the AUMF grants the President *statutory* authority to detain al-Marri as an enemy combatant. Alternatively, the Government asserts that the President has inherent *constitutional*

---

[6]*Hamdi* recognizes that the sole process that the Government need provide in order to initially detain an enemy combatant is a presidential determination that the detention is necessary. 342 U.S. at 518. Of course, *Hamdi* also reaffirms that the writ of habeas corpus provides a remedy to challenge collaterally the legality of the ongoing detention. *Id.* at 525-26. Although the habeas remedy follows from the Suspension Clause, the *Hamdi* plurality borrowed the due process balancing approach from *Mathews v. Eldridge*, 424 U.S. 319 (1976), to design the specific requirements of this habeas remedy. *Hamdi*, 542 U.S. at 525-35.

authority to order al-Marri's indefinite military detention. Al-Marri maintains that the proffered evidence does not establish that he fits within the "legal category" of enemy combatant and so the AUMF does not authorize the President to order the military to seize and detain him, and that the President has no inherent constitutional authority to order this detention. We now turn to these contentions.

B.

The Government's primary argument is that the AUMF, as construed by precedent and considered against "the legal background against which [it] was enacted," i.e. constitutional and law-of-war principles, empowers the President to order the military to seize and detain al-Marri as an enemy combatant. The AUMF provides:

> . . . the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

115 Stat. 224.[7] In considering the Government's AUMF argument, we first note the limits the Government places on its interpretation of this statute, and then consider the Government's central contention.

1.

Tellingly, the Government does *not* argue that the broad language of the AUMF authorizes the President to subject to indefinite military detention anyone he believes to have aided any "nation[ ], organiza-

---

[7]Although the Government asserts in a footnote that the MCA "buttresses" the President's "inherent authority" to detain al-Marri, it does not assert that the MCA provides statutory authority to detain enemy combatants. Plainly, the MCA provides no such authority, for it addresses only whether a detained individual is an *unlawful* enemy combatant subject to military trial, not whether an individual with constitutional rights seized in this country qualifies as an enemy combatant in the first instance.

tion[ ], or person[ ]" related to the September 11th attacks. Such an interpretation would lead to absurd results that Congress could not have intended. Under that reading of the AUMF, the President would be able to subject to indefinite military detention anyone, including an American citizen, whom the President believed was associated with any organization that the President believed in some way "planned, authorized, committed, or aided" the September 11th attacks, so long as the President believed this to be "necessary and appropriate" to prevent future acts of terrorism.

Under such an interpretation of the AUMF, if some money from a nonprofit charity that feeds Afghan orphans made its way to al Qaeda, the President could subject to indefinite military detention any donor to that charity. Similarly, this interpretation of the AUMF would allow the President to detain indefinitely any employee or shareholder of an American corporation that built equipment used by the September 11th terrorists; or allow the President to order the military seizure and detention of an American-citizen physician who treated a member of al Qaeda.

To read the AUMF to provide the President with such unlimited power would present serious constitutional questions, for the Supreme Court has long recognized that the Due Process Clause "cannot be . . . construed as to leave congress free to make any process 'due process of law,' by its mere will." *See Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 276-77 (1855).

2.

We need not here deal with the absurd results, nor reach the constitutional concerns, raised by an interpretation of the AUMF that authorizes the President to detain indefinitely — without criminal charge or process — anyone he believes to have aided any "nation[ ], organization[ ], or person[ ]" related to the September 11th terrorists. For the Government wisely limits its argument. It relies only on the scope of the AUMF as construed by precedent and considered in light of "the legal background against which [it] was enacted." Specifically, the Government contends that "[t]he Supreme Court's and this Court's prior construction of the AUMF govern this case and compel the con-

clusion that the President is authorized to detain al-Marri as an enemy combatant."

i.

The precedent interpreting the AUMF on which the Government relies for this argument consists of two cases: the Supreme Court's opinion in *Hamdi*, 542 U.S. 507, and our opinion in *Padilla v. Hanft*, 423 F.3d 386 (4th Cir. 2005). The "legal background" for the AUMF, which it cites, consists of two cases from earlier conflicts, *Ex Parte Quirin*, 317 U.S. 1 (1942) (World War II), and *Ex Parte Milligan*, 71 U.S. (4 Wall.) 2 (1866) (U.S. Civil War), as well as constitutional and law-of-war principles.

With respect to the latter, we note that American courts have often been reluctant to follow international law in resolving domestic disputes. In the present context, however, they, like the Government here, have relied on the law of war — treaty obligations including the Hague and Geneva Conventions and customary principles developed alongside them. The law of war provides clear rules for determining an individual's status during an international armed conflict, distinguishing between "combatants" (members of a nation's military, militia, or other armed forces, and those who fight alongside them) and "civilians" (all other persons).[8] *See, e.g.*, Geneva Convention Relative

---

[8]Thus, "civilian" is a term of art in the law of war, not signifying an innocent person but rather someone in a certain legal category, not subject to *military* seizure or detention. So too, a "combatant" is by no means always a wrongdoer, but rather a member of a different "legal category" who *is* subject to military seizure and detention. *Hamdi*, 542 U.S. at 522 n.1. For example, our brave soldiers fighting in Germany during World War II were "combatants" under the law of war, and viewed from Germany's perspective they were "enemy combatants." While civilians are subject to trial and punishment in civilian courts for all crimes committed during wartime in the country in which they are captured and held, combatant status protects an individual from trial and punishment by the capturing nation, unless the combatant has violated the laws of war. *See Hamdi*, 542 U.S. at 518; *Quirin*, 317 U.S. at 28-31. Nations in international conflicts can summarily remove the adversary's "combatants," i.e. the "enemy combatants," from the battlefield and detain them for the duration of such conflicts, but no such provision is made for "civilians." *Id.*

to the Treatment of Prisoners of War (Third Geneva Convention) arts. 2, 4, 5, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention) art. 4, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287. American courts have repeatedly looked to these careful distinctions made in the law of war in identifying which individuals fit within the "legal category" of "enemy combatants" under our Constitution. *See, e.g.*, *Hamdi*, 542 U.S. at 518; *Quirin*, 317 U.S. at 30-31 & n.7; *Milligan*, 71 U.S. at 121-22; *Padilla*, 423 F.3d at 391.

In the case at hand, the Government asserts that the construction given the AUMF in *Hamdi* and *Padilla* — based on these law-of-war principles — "compel[s] the conclusion that the President is authorized [by the AUMF] to detain al-Marri as an enemy combatant." In other words, the Government contends that al-Marri fits within the "legal category" of persons that the Supreme Court in *Hamdi*, and this court in *Padilla*, held the AUMF authorized the President to detain as enemy combatants. Thus, we examine those cases to determine whether the interpretation of the AUMF they adopt does indeed empower the President to treat al-Marri as an enemy combatant.

In *Hamdi*, the Supreme Court looked to precedent and the law of war to determine whether the AUMF authorized the President to detain as an enemy combatant an American citizen captured while engaging in battle against American and allied armed forces in Afghanistan as part of the Taliban. *See Hamdi*, 542 U.S. at 518-22. In support of that detention, the Government offered evidence that Yaser Esam Hamdi "affiliated with a Taliban military unit and received weapons training," "took up arms with the Taliban," "engaged in armed conflict against the United States" in Afghanistan, and when captured on the battlefield "surrender[ed] his Kalishnikov assault rifle." *Hamdi*, 542 U.S. at 510, 513, 516 (internal quotation marks omitted). Hamdi's detention was upheld because in fighting against the United States on the battlefield in Afghanistan with the Taliban, the de facto government of Afghanistan at the time,[9] Hamdi

---

[9]*See* White House Fact Sheet: Status of Detainees at Guantanamo (Feb. 7, 2002), http://www.pegc.us/archive/White_House/20020207_ WH_POW_fact_sheet.txt; *see also* Protocol Additional to the Geneva

bore arms with the army of an enemy nation and so, under the law of war, was an enemy combatant. *Hamdi*, 542 U.S. at 518-20.

The *Hamdi* Court expressly recognized that the AUMF did not explicitly provide for detention. *Id.* at 519; *see also id.* at 547 (Souter, J., concurring). It concluded, however, "in light of" the law-of-war principles applicable to Hamdi's battlefield capture, that this was "of no moment" in the case before it. *Id.* at 519 (plurality). As the plurality explained, "[b]ecause detention to prevent a combatant's *return to the battlefield* is a fundamental incident of waging war, in permitting the use of 'necessary and appropriate force,' Congress has clearly and unmistakably authorized detention in the *narrow circumstances considered here*." *Id.* (emphasis added). Thus, the *Hamdi* Court reached the following limited holding: "the AUMF is explicit congressional authorization for the detention of individuals in the *narrow category* we describe," that is, individuals who were "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there." *Hamdi*, 542 U.S. at 516-17 (plurality) (internal quotation marks omitted) (emphasis added); *accord id.* at 587 (Thomas, J., dissenting). Indeed, the plurality expressly explained that its opinion "only finds legislative authority to detain under the AUMF once it is sufficiently clear that the individual *is*, in fact, an enemy combatant." *Id.* at 523 (plurality) (emphasis added).

In *Padilla*, we similarly held that the AUMF authorized the President to detain as an enemy combatant an American citizen who "was armed and present in a combat zone" in Afghanistan as part of Taliban forces during the conflict there with the United States. 423 F.3d at 390-91 (internal quotation marks omitted). The Government had not been able to capture Jose Padilla until he came to the border of the United States, but because the Government presented evidence

---

Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I), June 8, 1977, arts. 43-44, 1125 U.N.T.S. 3 (defining combatants in conflicts between nations as members, other than chaplains and medical personnel, of "all organized armed forces, groups and units which are under a command responsible to that [nation] for the conduct of its subordinates").

that Padilla "took up arms against United States forces in [Afghani-
stan] in the same way and to the same extent as did Hamdi" we con-
cluded that he "unquestionably qualifies as an 'enemy combatant' as
that term was defined for the purposes of the controlling opinion in
*Hamdi*." 423 F.3d at 391.[10] We too invoked the law of war, upholding
Padilla's detention because we understood "the plurality's *reasoning*
in *Hamdi* to be that the AUMF authorizes the president to detain all
who qualify as 'enemy combatants' within the meaning of the laws

---

[10]Although our opinion discussed Padilla's association with al Qaeda,
we *held* that Padilla was an enemy combatant because of his association
with Taliban forces, i.e. Afghanistan government forces, on the battle-
field in Afghanistan during the time of the conflict between the United
States and Afghanistan. *Padilla*, 423 F.3d at 391. Al-Marri urges us to
ignore *Padilla* in light of its subsequent history. *See Padilla v. Hanft*, 432
F.3d 582, 583 (4th Cir. 2005) (noting that the Government's transfer of
Padilla to civilian custody for criminal trial after arguing before this
court that he was an enemy combatant created "an appearance that the
government may be attempting to avoid consideration of our decision by
the Supreme Court"). That history is troubling but we see no need to
avoid *Padilla*'s narrow holding.

We do wish to respond to points concerning *Padilla* raised by our
friend in dissent. First, we do not, as the dissent suggests, *post* at 55-56,
ignore *Padilla*'s holding that an individual qualifying as an "enemy com-
batant" may be captured and detained in the United States. *Padilla* pro-
vides no precedent for al-Marri's military capture and detention in this
country because al-Marri, for the reasons explained in text, is *not* an
enemy combatant. We emphasize the place of al-Marri's capture and
detention only to establish that, as an alien lawfully residing in this coun-
try, he is protected by the Due Process Clause and so cannot be seized
and indefinitely detained by the military unless he qualifies as an enemy
combatant. Second, we do not hold, in conflict with *Padilla*, that al-
Marri cannot be detained in military custody because the Government
could criminally prosecute him. *Id.* at 55-56. If al-Marri, like Padilla, did
qualify as an enemy combatant, then the Government could choose to
either detain him or prosecute him (if it established that he was not enti-
tled to immunity from criminal prosecution as a lawful combatant). That
said, given the dissent's acknowledgment, *id.* at 56, that unlike Padilla,
al-Marri has never been "in a combat zone," we do not see how his
detention as an enemy combatant could achieve the asserted purpose of
such detention, i.e. "the prevention of return to the field of battle." *Id.* at
56 (*quoting Padilla*, 423 F.3d at 394-95).

of war." *Id.* at 392. We also noted that Padilla's detention, like Hamdi's, was permissible "'to prevent a *combatant's return to the battlefield . . .* a fundamental incident of waging war.'" *Id.* at 391 *(quoting Hamdi*, 542 U.S. at 519) (emphasis added).

Supreme Court precedent offered substantial support for the narrow rulings in *Hamdi* and *Padilla*. In *Quirin*, which the *Hamdi* plurality characterized as the "most apposite precedent," 542 U.S. at 523, the Supreme Court upheld the treatment, as enemy combatants, of men directed, outfitted, and paid by the German military to bring explosives into the United States to destroy American war industries during World War II. The *Quirin* Court concluded that even a petitioner claiming American citizenship had been properly classified as an enemy combatant because "[c]itizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this county bent on hostile acts, are enemy belligerents [combatants] within the meaning of . . . the law of war." *Quirin*, 317 U.S. at 37-38. The Court cited the Hague Convention "which defines the persons to whom belligerent [i.e. combatant] rights and duties attach," *id.* at 30-31 n.7, in support of its conclusion that the *Quirin* petitioners qualified as enemy combatants. Given the "declaration of war between the United States and the German Reich," *id.* at 21, and that all the *Quirin* petitioners, including one who claimed American citizenship, were directed and paid by the "military arm" of the German Reich, the Court held that the law of war classified them as enemy belligerents (or combatants) and so the Constitution permitted subjecting them to military jurisdiction. *Id.* at 48.

*Hamdi* and *Padilla* ground their holdings on this central teaching from *Quirin*, i.e., enemy combatant status rests on an individual's affiliation during wartime with the "military arm of the enemy government." *Quirin*, 317 U.S. at 37-38; *Hamdi*, 542 U.S. at 519; *see also Padilla*, 423 F.3d at 391. In *Quirin* that enemy government was the German Reich; in *Hamdi* and *Padilla*, it was the Taliban government of Afghanistan.

*Hamdi* and *Padilla* also rely on this principle from *Quirin* to distinguish (but not disavow) *Milligan*. In *Milligan*, the Court rejected the Government's impassioned contention that a presidential order and the "laws and usages of war," 71 U.S. at 121-22, justified exercising

military jurisdiction over Lamdin Milligan, an Indiana resident, during the Civil War. The Government alleged that Milligan had communicated with the enemy, had conspired to "seize munitions of war," and had "join[ed] and aid[ed] . . . a secret" enemy organization "for the purpose of overthrowing the Government and duly constituted authorities of the United States." *Id.* at 6. The Court recognized that Milligan had committed "an enormous crime" during "a period of war" and at a place "within . . . the theatre of military operations, and which had been and was constantly threatened to be invaded by the enemy." *Id.* at 7, 130. But it found no support in the "laws and usages of war" for subjecting Milligan to military jurisdiction as a combatant, for although he was a "dangerous enem[y]" of the nation, he was a civilian, and had to be treated as such. *Id.* at 121-22, 130.

*Quirin*, *Hamdi*, and *Padilla* all emphasize that *Milligan*'s teaching — that our Constitution does not permit the Government to subject *civilians* within the United States to military jurisdiction — remains good law. The *Quirin* Court explained that while the petitioners before it were affiliated with the armed forces of an enemy nation and so were enemy belligerents, Milligan was a "non-belligerent" and so "not subject to the law of war." 317 U.S. at 45. The *Hamdi* plurality similarly took care to note that *Milligan* "turned in large part on the fact that Milligan was not a prisoner of war" (i.e. combatant) and suggested that "[h]ad Milligan been captured while he was assisting Confederate soldiers by carrying a rifle against Union troops on a Confederate battlefield, the holding of the Court might well have been different." 542 U.S. at 522. And in *Padilla*, we reaffirmed that "*Milligan* does not extend to enemy combatants" and so "is inapposite here because Padilla, unlike Milligan, associated with, and has taken up arms against the forces of the United States on behalf of, an enemy of the United States." 423 F.3d at 396-97. Thus, although *Hamdi*, *Quirin*, and *Padilla* distinguish *Milligan*, they recognize that its core holding remains the law of the land. That is, civilians within this country (even "dangerous enemies" like Milligan who perpetrate "enormous crime[s]" on behalf of "secret" enemy organizations bent on "overthrowing the Government" of this country) may not be subjected to military control and deprived of constitutional rights.[11]

---

[11]Because of this important principle, the Supreme Court has hailed *Milligan* as "one of the great landmarks in th[e] Court's history." *Reid*,

In sum, the holdings of *Hamdi* and *Padilla* share two characteristics: (1) they look to law-of-war principles to determine who fits within the "legal category" of enemy combatant; and (2) following the law of war, they rest enemy combatant status on affiliation with the military arm of an enemy nation.

ii.

In view of the holdings in *Hamdi* and *Padilla*, we find it remarkable that the Government contends that they "compel the conclusion" that the President may detain al-Marri as an enemy combatant. For unlike Hamdi and Padilla, al-Marri is not alleged to have been part of a Taliban unit, not alleged to have stood alongside the Taliban or the armed forces of any other enemy nation, not alleged to have been on the battlefield during the war in Afghanistan, not alleged to have even been in Afghanistan during the armed conflict there, and not alleged to have engaged in combat with United States forces anywhere in the world. *See* Rapp Declaration (alleging none of these

---

354 U.S. at 30. Although the Government largely avoids *Milligan*, it implicitly acknowledges this point and so attempts to distinguish *Milligan* from the case at hand on the ground that Milligan was a citizen, and al-Marri an alien. In some circumstances the Constitution does afford aliens less protection than citizens. *See, e.g.*, *Hamdi*, 542 U.S. at 558-59 (Scalia, J., dissenting) (suggesting that during war the constitutional rights of an "enemy alien," whom the Supreme Court has defined as a "subject of a foreign state at war with the United States," *Eisentrager*, 339 U.S. at 769 n.2 (internal quotation marks omitted), differ from those of a treasonous citizen); *Verdugo-Urquidez*, 494 U.S. at 274-75 (holding that the Fourth Amendment does not apply to searches by United States agents of property owned by aliens *in* foreign countries). But the distinction between citizens and aliens provides no basis for depriving an alien like al-Marri, lawfully resident within the United States and not the subject of an enemy nation, of those rights guaranteed by the Due Process Clause. Rather, the Supreme Court has repeatedly held that aliens situated like al-Marri have an unquestioned right to the due process of law. *See Wong Wing*, 163 U.S. at 238; *see also Verdugo-Urquidez*, 494 U.S. at 271; *id.* at 278 (Kennedy, J., concurring) (observing that "[a]ll would agree . . . that the dictates of the Due Process Clause of the Fifth Amendment protect" an alien lawfully within the United States). The Government does not dispute or distinguish these cases; it simply ignores them.

facts, but instead that "Al-Marri engaged in conduct in preparation for acts of international terrorism intended to cause injury or adverse effects on the United States").

In place of the "classic wartime detention" that the Government argued justified Hamdi's detention as an enemy combatant, *see* Br. of Respondents at 20-21, 27, *Hamdi*, 542 U.S. 507 (No. 03-6696), or the "classic battlefield" detention it maintained justified Padilla's, *see* Opening Br. for the Appellant at 16, 20, 29, 51, *Padilla*, 432 F.3d 386 (No. 05-6396), here the Government argues that al-Marri's seizure and indefinite military detention in this country are justified "because he engaged in, and continues to pose a very real threat of carrying out, . . . acts of international terrorism." And instead of seeking judicial deference to decisions of "military officers who are engaged in the serious work of waging battle," *Hamdi*, 542 U.S. at 531-32, the Government asks us to defer to the "multi-agency evaluation process" of government bureaucrats in Washington made eighteen months after al-Marri was taken into custody. Neither the holding in *Hamdi* nor that in *Padilla* supports the Government's contentions here.

In arguing to the contrary, the Government confuses certain secondary arguments it advanced in *Hamdi* and *Padilla* with the actual holdings in those cases. As discussed above, both *Hamdi* and *Padilla* upheld the President's authority pursuant to the AUMF to detain as enemy combatants individuals (1) who affiliated with and fought on behalf of Taliban government forces, (2) against the armed forces of the United States and its allies, (3) on the battlefield in Afghanistan. In both cases, however, the Government also contended that the AUMF provided the President with even broader authority to subject to military detention, as enemy combatants, persons otherwise involved "in the global armed conflict against the al Qaeda terrorist network." Br. of Respondents at 20-21, *Hamdi*, 542 U.S. 507 (No. 03-6996); *see* Opening Br. for the Appellant at 17-18, *Padilla*, 423 F.3d 386 (No. 05-6396).

But neither the Supreme Court in *Hamdi*, nor this court in *Padilla*, accepted the Government's invitation to fashion such a broad construction of the AUMF. Instead, the *Hamdi* plurality emphasized the narrowness of its holding, *id.* at 509, 516, 517, and the "limited category" of individuals controlled by that holding, *id.* at 518. In *Padilla*,

we similarly saw no need to embrace a broader construction of the AUMF than that adopted by the Supreme Court in *Hamdi*. Indeed, the Government itself *principally* argued that Padilla was an enemy combatant because he, like Hamdi, "engaged in armed conflict" alongside the Taliban "against our forces in Afghanistan." *See* Opening Br. for the Appellant at 22-23, 27, *Padilla*, 423 F.3d 386 (No. 05-6396).[12]

Thus, the Government is mistaken in its representation that *Hamdi* and *Padilla* "recognized" "[t]he President's authority to detain 'enemy combatants' during the current conflict with al Qaeda." No precedent recognizes any such authority. *Hamdi* and *Padilla* evidence no sympathy for the view that the AUMF permits indefinite military detention beyond the "limited category" of people covered by the "narrow circumstances" of those cases. Therefore the Government's primary argument — that *Hamdi* and *Padilla* "compel the conclusion" that the AUMF authorizes the President "to detain al-Marri as an enemy combatant" — fails.

3.

The Government offers no other legal precedent, rationale, or authority justifying its position that the AUMF empowers the President to detain al-Marri as an enemy combatant. The *Hamdi* plurality, however, noted that because it had not "elaborated" on "[t]he legal category of enemy combatant," "[t]he permissible bounds of the cate-

---

[12]In doing so, the Government acknowledged, *id.* at 29-30, our distinguished colleague Judge Wilkinson's statement that "[t]o compare [Hamdi's] battlefield capture to the domestic arrest in *Padilla v. Rumsfeld* is to compare apples and oranges," *Hamdi v. Rumsfeld*, 337 F.3d 335, 344 (4th Cir. 2003) (Wilkinson, J., concurring in the denial of rehearing en banc), but explained that Judge Wilkinson's observation came *before* the Government had proffered any evidence that Padilla had carried arms alongside the Taliban against United States armed forces during the conflict in Afghanistan. In other words, at the time Judge Wilkinson differentiated Hamdi from Padilla, the Government's allegations against Padilla mirrored its allegations against al-Marri here — that he had associated with al Qaeda and engaged in conduct in preparation for acts of terrorism. We agree with Judge Wilkinson's characterization: to compare Hamdi's battlefield capture to the domestic arrest of al-Marri is indeed "to compare apples and oranges." *Id.*

gory will be defined by the lower courts as subsequent cases are presented to them." *Hamdi*, 542 U.S. at 522 n.1. As a "lower court" in this "subsequent case[ ]," we have searched extensively for authority that would support the Government's contention that al-Marri fits within the "permissible bounds" of "the legal category of enemy combatant." As explained below, we have found none. Certainly, the Supreme Court's most recent terrorism case, *Hamdan*, 126 S. Ct. 2749, and the law-of-war principles it identifies provide no support for that contention. Moreover, contrary to the Government's apparent belief, no precedent and nothing in the "legal background against which the AUMF was enacted" permits a person to be classified as an enemy combatant because of his criminal conduct on behalf of an enemy organization. And, the AUMF itself neither classifies certain civilians as enemy combatants, nor otherwise authorizes the President to subject civilians to indefinite military detention.

i.

Rather than supporting the Government's position, the Supreme Court's most recent terrorism case provides an additional reason for rejecting the contention that al-Marri is an enemy combatant. In *Hamdan*, the Court held that because the conflict between the United States and al Qaeda in Afghanistan is not "between nations," it is a "'conflict not of an international character'" — and so is governed by Common Article 3 of the Geneva Conventions. *See* 126 S. Ct. at 2795; *see also id.* at 2802 (Kennedy, J., concurring). Common Article 3 and other Geneva Convention provisions applying to non-international conflicts (in contrast to those applying to international conflicts, such as that with Afghanistan's Taliban government) simply do *not* recognize the "legal category" of enemy combatant. *See* Third Geneva Convention, art. 3, 6 U.S.T. at 3318. As the International Committee of the Red Cross — the official codifier of the Geneva Conventions — explains, "an 'enemy combatant' is a person who, either lawfully or unlawfully, engages in hostilities for the opposing side in an *international* armed conflict;" in contrast, "[i]n non-international armed conflict combatant status *does not exist*." Int'l Comm. of the Red Cross, Official Statement: The Relevance of IHL in the Context of Terrorism, at 1, 3 (Feb. 21, 2005), http://

www.icrc.org/Web/Eng/siteeng0.nsf/htmlall/terrorism-ihl-210705 (emphasis added).[13]

Perhaps for this reason, the Government ignores *Hamdan*'s holding that the conflict with al Qaeda in Afghanistan is a non-international conflict, and ignores the fact that in such conflicts the "legal category" of enemy combatant does not exist. Indeed, the Government's sole acknowledgment of *Hamdan* in its appellate brief is a short footnote, in which it asserts that "the Court took it as a given that Hamdan was subject to detention as an enemy combatant during ongoing hostilities." The weakness of this response is apparent. Not only does it avoid the holding in *Hamdan* that the conflict between the United States and al Qaeda is a non-international conflict, but also it suggests that the Supreme Court approved Hamdan's detention when the legality of that detention was not before the Court, and in fact, the legality of the detention of those like Hamdan, captured and detained in the conflict with al Qaeda *outside* the United States, is still being litigated. *See, e.g.*, *Boumediene*, 476 F.3d 981.

Moreover, even were the Supreme Court ultimately to approve the

---

[13]Notwithstanding this principle, we recognize that some commentators have suggested that "for such time as they take a *direct* part in hostilities," participants in non-international armed conflicts may, as a matter of customary international law, be placed in the formal legal category of "enemy combatant." *See, e.g.*, Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2115 & n.304 (2005) (internal quotation marks omitted). No precedent from the Supreme Court or this court endorses this view, and the Government itself has *not* advanced such an argument. This may be because even were a court to follow this approach in *some* cases, it would not assist the Government here. For the Government has proffered no evidence that al-Marri has taken a "*direct* part in hostilities." Moreover, the United States has elsewhere adopted a formal treaty understanding of the meaning of the term "direct part in hostilities," which plainly excludes al-Marri. *See* Message from the President of the United States Transmitting Two Optional Protocols to the Convention on the Rights of the Child, S. Treaty Doc. No. 106-37, at VII (2000) (distinguishing between "immediate and actual action on the battlefield" and "indirect participation," including gathering and transmitting military information, weapons, and supplies).

detention of Hamdan and those like him, that would not bolster the
Government's position at all in the case at hand.[14] This is so because,
since the legal status of "enemy combatant" does not exist in non-
international conflicts, the law of war leaves the detention of persons
in such conflicts to the applicable law of the detaining country. In al-
Marri's case, the applicable law is our Constitution. Thus, even if the
Supreme Court should hold that the Government may detain indefi-
nitely Hamdan and others like him, who were captured *outside* the
United States and lacked substantial and voluntary connections to this
country, that would provide no support for approving al-Marri's mili-
tary detention. For not only was al-Marri seized and detained *within*
the United States, he also has substantial connections to the United
States, and so plainly is protected by the Due Process Clause.

ii.

The core assumption underlying the Government's position, not-
withstanding *Hamdi*, *Padilla*, *Quirin*, *Milligan*, and *Hamdan*, seems
to be that persons lawfully within this country, entitled to the protec-
tions of our Constitution, lose their civilian status and become "enemy
combatants" if they have allegedly engaged in criminal conduct on
behalf of an organization seeking to harm the United States. Of
course, a person who commits a crime should be punished, but when
a civilian protected by the Due Process Clause commits a crime he
is subject to charge, trial, and punishment in a civilian court, *not* to
seizure and confinement by military authorities.

---

[14]The Supreme Court has yet to hold that there is a non-international
armed conflict between the United States and al Qaeda *within the United
States*. Non-international conflicts "occur[ ] in the territory of *one* of the
High Contracting Parties," *Hamdan*, 126 S. Ct. at 2795 (*quoting* Third
Geneva Convention, 6 U.S.T. at 3318) (emphasis added) — and *Hamdan*
only found there to be a conflict between the United States and al Qaeda
*in Afghanistan*. Of course, al-Marri is not a participant in any conflict
involving the United States in Afghanistan. Although the Government
alleges that al-Marri attended an al Qaeda training camp in Afghanistan
years before September 11th, it has proffered no evidence that al-Marri
was involved in the conflict between the United States and al Qaeda *in
Afghanistan* — nor could it, for al-Marri has not been in Afghanistan at
any point during that conflict.

We recognize the understandable instincts of those who wish to treat domestic terrorists as "combatants" in a "global war on terror." Allegations of criminal activity in association with a terrorist organization, however, do not permit the Government to transform a civilian into an enemy combatant subject to indefinite military detention, any more than allegations of murder in association with others while in military service permit the Government to transform a civilian into a soldier subject to trial by court martial. *See United States ex rel. Toth v. Quarles*, 350 U.S. 11, 23 (1955) (holding that ex-servicemen, "like other civilians, are entitled to have the benefit of safeguards afforded those tried in the regular courts authorized by Article III of the Constitution").

To be sure, enemy combatants may commit crimes just as civilians may. When an enemy combatant violates the law of war, that conduct will render the person an "unlawful" enemy combatant, subject not only to detention but also to military trial and punishment. *Quirin*, 317 U.S. at 31. But merely engaging in unlawful behavior does not make one an enemy combatant. *Quirin* well illustrates this point. The *Quirin* petitioners were first enemy combatants — associating themselves with the military arm of the German government with which the United States was at war. They became *unlawful* enemy combatants when they violated the laws of war by "without uniform com-[ing] secretly through the lines for the purpose of waging war." *Id.* By doing so, in addition to being subject to military detention for the duration of the conflict as enemy combatants, they also became "subject to trial and punishment by military tribunals for acts which render their belligerency illegal." *Id.* Had the *Quirin* petitioners never "secretly and without uniform" passed our "military lines," *id.*, they still would have been enemy combatants, subject to military detention, but would not have been *unlawful* enemy combatants subject to military trial and punishment.

Neither *Quirin* nor any other precedent even suggests, as the Government seems to believe, that individuals with constitutional rights, unaffiliated with the military arm of any enemy government, can be subjected to military jurisdiction and deprived of those rights solely on the basis of their conduct on behalf of an enemy organization.[15] In

---

[15]The distinction between organizations and nations is not without rationale. The law of war refuses to classify persons affiliated with ter-

fact, *Milligan* rejected the Government's attempt to do just this. There, the Court acknowledged that Milligan's conduct — not "mere association" with, *cf. post* at n.3, but also "joining and aiding" a "secret political organization, armed to oppose the laws, and seek[ing] by stealthy means to introduce the enemies of the country into peaceful communities, there to . . . overthrow the power of the United States" — made him and his co-conspirators "dangerous enemies to their country." 71 U.S. at 6, 130. But the Government did not allege that Milligan took orders from any enemy government or took up arms

---

rorist organizations as enemy combatants for fear that doing so would immunize them from prosecution and punishment by civilian authorities in the capturing country. *See, e.g.*, Message from the President of the United States Transmitting the Protocol II Additional to the 1949 Geneva Conventions, and Relating to the Protection of Victims of Noninternational Armed Conflicts, S. Treaty Doc. No. 100-2, at IV (1987) (explaining President Reagan's recommendation against ratifying a treaty provision that "would grant combatant status to irregular forces" and so "give recognition and protection to terrorist groups"). Moreover, a rule permitting indefinite military detention as "enemy combatants" of members of an "armed" organization, even one "seek[ing] . . . to . . . overthrow" a government, in addition to being contrary to controlling precedent, *Milligan*, 71 U.S. at 130, could well endanger citizens of this country or our allies. For example, another nation, purportedly following this rationale, could proclaim a radical environmental organization to be a terrorist group, and subject American members of the organization traveling in that nation to indefinite military detention.

The dissent properly recognizes the distinction between an organization and a nation's armed forces, acknowledging that an allegation of "mere association" with an organization, including al Qaeda, does not necessarily establish enemy combatant status permitting detention under the AUMF. *Post* at n.3. The dissent suggests, however, that if the Government alleges that a person affiliates with an organization and commits criminal acts with the "*purpose* of . . . facilitating terrorist activities," *id.* (*quoting* Rapp Declaration (emphasis added)), that would qualify him for enemy combatant status, permitting military detention under the AUMF. But the *Hamdi* plurality outlined a procedure to verify an individual's *status*, not to determine whether he harbored a particular purpose or intent. In this country, the only appropriate way to determine whether a person can be imprisoned for harboring a particular purpose or intent is through the criminal process.

against this country on the battlefield. And so the Court prohibited the Government from subjecting Milligan to military jurisdiction for his "enormous crime." *Id.*

Although Milligan was an "enem[y]" of the country and associated with an organization seeking to "overthrow[ ] the Government" of this country, he was still a civilian. *Id.* Milligan's conduct mirrors the Government's allegations against al-Marri. If the Government's allegations are true, like Milligan, al-Marri is deplorable, criminal, and potentially dangerous, but like Milligan he is a civilian nonetheless.[16]

---

[16]The Government's treatment of al-Marri, i.e. subjecting him to military detention, which the Government insists "is not 'punishment,'" is at odds with the Government's repeated recognition that criminal terrorist conduct by aliens *in this country* merits punishment by a civilian court, not indefinite military detention as an enemy combatant. *See, e.g.*, *United States v. Abdi*, 463 F.3d 547, 550 (6th Cir. 2006) (civilian prosecution of suspected al-Qaeda terrorist who allegedly "indicated a desire to 'shoot up' a Columbus shopping mall with an AK-47"); *United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004) (civilian prosecution of surviving al Qaeda conspirator involved in the September 11th attacks); *United States v. Reid*, 369 F.3d 619, 619-20 (1st Cir. 2004) (civilian prosecution of terrorist allied with Bin Laden who attempted to destroy airplane with explosives); *United States v. Goba*, 240 F. Supp. 2d 242, 244 (W.D.N.Y. 2003) (civilian prosecution of associates of al Qaeda, including those who met with Bin Laden and trained in terrorist camps in Afghanistan). Moreover, the Government is now prosecuting Jose Padilla in civilian court for his crimes. This practice is hardly new. Even the civilian co-conspirators of the *Quirin* petitioners were tried for their crimes in civilian courts. *See Cramer v. United States*, 325 U.S. 1 (1945); *United States v. Haupt*, 136 F.2d 661 (7th Cir. 1943).

The Government's treatment of others renders its decision to halt al-Marri's criminal prosecution — on the eve of a pre-trial hearing on a suppression motion — puzzling at best. Al-Marri contends that the Government has subjected him to indefinite military detention, rather than see his criminal prosecution to the end, in order to interrogate him without the strictures of criminal process. We trust that this is not so, for such a stratagem would contravene *Hamdi*'s injunction that "indefinite detention for the purpose of interrogation is not authorized." 542 U.S. at 521. We note, however, that not only has the Government offered no other explanation for abandoning al-Marri's prosecution, it has even pro-

### iii.

Finally, we note that the AUMF itself contains nothing that transforms a civilian into a combatant subject to indefinite military detention. Indeed, the AUMF contains only a broad grant of war powers and lacks any specific language authorizing detention. For this reason, the *Hamdi* plurality explained that its opinion "only finds legislative authority to detain under the AUMF once it is sufficiently clear that the individual *is*, in fact, an enemy combatant." *Hamdi*, 542 U.S. at 523 (emphasis added). Although the military detention of enemy combatants like Hamdi is certainly "a fundamental incident of waging war," *id.* at 519, the military detention of civilians like al-Marri just as certainly is not. Notably, even the Government does not contend that the AUMF transforms civilians into combatants or authorizes the President to classify civilians as enemy combatants and so detain them in military custody.

Moreover, assuming the Constitution permitted Congress to grant the President such an awesome and unprecedented power, if Congress intended to grant this authority it could and would have said so explicitly. The AUMF lacks the particularly clear statement from Congress that would, at a minimum, be necessary to authorize the classification and indefinite military detention of *civilians* as "enemy combatants." *See, e.g.*, *Greene v. McElroy*, 360 U.S. 474, 508 (1959) (rejecting Government argument that Executive Orders and statutes permitted deprivation of liberty rights absent "explicit authorization" in them); *Duncan v. Kahanamoku*, 327 U.S. 304, 324 (1946) (rejecting Government argument that statute authorized trial of civilians by military tribunals because Congress could not have intended "to exceed the boundaries between military and civilian power, in which

---

pounded an affidavit in support of al-Marri's continued military detention stating that he "possesses information of high intelligence value." *See* Rapp Declaration. Moreover, former Attorney General John Ashcroft has explained that the Government decided to declare al-Marri an "enemy combatant" only after he became a "hard case" by "reject[ing] numerous offers to improve his lot by . . . providing information." John Ashcroft, *Never Again: Securing America and Restoring Justice* 168-69 (2006).

our people have always believed"); *Ex Parte Endo*, 323 U.S. 283, 300 (1944) (rejecting Government argument that a "wartime" executive order and statute permitted detention of citizen of Japanese heritage when neither "use[d] the language of detention"); *Brown v. United States*, 12 U.S. (8 Cranch) 110, 128-29 (1814) (rejecting Government argument that declaration of war authorized confiscation of enemy property because it did not clearly "declare[ ]" the legislature's "will"). We are exceedingly reluctant to infer a grant of authority that is so far afield from anything recognized by precedent or law-of-war principles, especially given the serious constitutional concerns it would raise.

Furthermore, shortly after Congress enacted the AUMF, it enacted another statute that did explicitly authorize the President to arrest and detain "terrorist aliens" living within the United States believed to have come here to perpetrate acts of terrorism. *See* Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 (hereinafter "Patriot Act"), Pub. L. No. 107-56, 115 Stat. 272. However, that statute only authorizes detention for a limited time pending deportation or trial, pursuant to *civilian* law enforcement processes, and accompanied by careful congressional oversight. *See infra* Section III.C.1. The explicit authorization for limited detention and criminal process in civilian courts in the Patriot Act provides still another reason why we cannot assume that Congress silently empowered the President in the AUMF to order the indefinite military detention without any criminal process of civilian "terrorist aliens" as "enemy combatants."

We note that this does *not* mean that we accept al-Marri's contention that the Patriot Act affirmatively prohibits the detention of all suspected terrorist aliens within this country as enemy combatants. Plainly, the Patriot Act does not eliminate the statutory authority provided the President in the AUMF to detain individuals who fit within the "legal category" of enemy combatant; thus, if an alien "qualif-[ies]" as an enemy combatant, then the AUMF authorizes his detention. *Hamdi*, 542 U.S. at 516. But if there were any conflict between the Patriot Act and the AUMF as to the legality of the detention of terrorist alien *civilians* within the United States, we would have to give precedence to the Patriot Act — for while the Patriot Act's

explicit and specific focus is on detention of terrorist aliens within the United States, the AUMF lacks any language permitting such detention. *See Hamdi*, 542 U.S. at 519. And the Supreme Court has instructed that "a more specific statute will be given precedence over a more general one, regardless of their temporal sequence." *Busic v. United States*, 446 U.S. 398, 406 (1980); *see also Edmond v. United States*, 520 U.S. 651, 657 (1997).

In sum, the Government has not offered, and although we have exhaustively searched, we have not found, any authority that permits us to hold that the AUMF empowers the president to detain al-Marri as an enemy combatant. If the Government's allegations are true, and we assume they are for present purposes, al-Marri, like Milligan, is a dangerous enemy of this nation who has committed serious crimes and associated with a secret enemy organization that has engaged in hostilities against us. But, like Milligan, al-Marri is still a civilian: he does not fit within the "permissible bounds of" "[t]he legal category of enemy combatant." *Hamdi*, 542 U.S. at 522 n.1. Therefore, the AUMF provides the President no statutory authority to order the military to seize and indefinitely detain al-Marri.

### C.

Accordingly, we turn to the Government's final contention. The Government summarily argues that even if the AUMF does not authorize al-Marri's seizure and indefinite detention as an enemy combatant, the President has "inherent constitutional authority" to order the military to seize and detain al-Marri. The Government maintains that the President's "war-making powers" granted him by Article II "include the authority to capture and detain individuals involved in hostilities against the United States." In other words, according to the Government, the President has "inherent" authority to subject persons legally residing in this country and protected by our Constitution to military arrest and detention, without the benefit of any criminal process, if the President believes these individuals have "engaged in conduct in preparation for acts of international terrorism." *See* Rapp Declaration. This is a breathtaking claim, for the Government nowhere represents that this "inherent" power to order indefinite military detention extends only to aliens or only to those who "qualify" within the "legal category" of enemy combatants.

To assess claims of presidential power, the Supreme Court has long recognized, as Justice Kennedy stated most recently, that courts look to the "framework" set forth by Justice Jackson in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-38 (1952) (Jackson, J., concurring). *See Hamdan*, 126 S. Ct. at 2800 (Kennedy, J., concurring). Justice Jackson explained that "Presidential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum," *id.*, but "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb," *id.* at 637. Hence, to evaluate the President's constitutional claim we must first look to the "expressed or implied will of Congress" as to detention of aliens captured within the United States alleged to be engaged in terrorist activity.

1.

In fact, in the Patriot Act, Congress carefully stated how it wished the Government to handle aliens believed to be terrorists who were seized and held within the United States. In contrast to the AUMF, which is silent on the detention of asserted alien terrorists captured and held within the United States, the Patriot Act, enacted shortly after the AUMF, provides the Executive with broad powers to deal with "terrorist aliens." But the Patriot Act *explicitly prohibits* their indefinite detention.

Section 412 of the Patriot Act, entitled "Mandatory Detention of Suspected Terrorists," permits the short-term "[d]etention of [t]errorist [a]liens." Patriot Act § 412(a). The statute authorizes the Attorney General to detain any alien whom he "has reasonable grounds to believe" is "described in" certain sections of the United States Code. *Id.* These code sections, in turn, "describe" aliens who: (1) "seek[ ] to enter the United States" to "violate any law of the United States relating to espionage or sabotage" or to use "force, violence, or other unlawful means" in opposition to the government of the United States; or (2) have "engaged in a terrorist activity;" or (3) the Attorney General reasonably believes are "likely to engage after entry in any terrorist activity," have "incited terrorist activity," are

"representative[s]" or "member[s]" of a "terrorist organization" or are "representative[s]" of a "group that endorses or espouses terrorist activity," or have "received military-type training" from a terrorist organization. 8 U.S.C.A. § 1182(a)(3)(A) and (B) (West 2007); *see also* 8 U.S.C. §§ 1227(a)(4)(A)(I), (iii); 1227(a)(4)(B) (West 2007). In addition, the Patriot Act authorizes the Attorney General to detain any other alien who "is engaged in any other activity that endangers the national security of the United States." Patriot Act § 412(a). In particular, the Patriot Act permits the Attorney General to "take into custody" any "terrorist aliens" based only on the Attorney General's "belie[fs]" as to the aliens' threat, with *no* process or evidentiary hearing, and judicial review only through petition for habeas corpus. *Id.* § 412(a).

Recognizing the breadth of this grant of power, however, Congress also imposed strict limits in the Patriot Act on the duration of the detention of such "terrorist aliens" within the United States. Thus, the Patriot Act expressly prohibits unlimited "indefinite detention;" instead it requires the Attorney General either to begin "removal proceedings" or to "charge the alien with a criminal offense" "not later than 7 days after the commencement of such detention." *Id.* § 412(a). If a terrorist alien's removal "is unlikely for the reasonably foreseeable future," he "may be detained for additional periods of up to six months" if his release "will threaten the national security of the United States." *Id.* But no provision of the Patriot Act allows for unlimited indefinite detention. Moreover, the Attorney General must provide the legislature with reports on the use of this detention authority every six months, which must include the number of aliens detained, the grounds for their detention, and the length of the detention. *Id.* § 412(c).

Therefore, the Patriot Act establishes a specific method for the Government to detain aliens affiliated with terrorist organizations, who the Government believes have come to the United States to endanger our national security, conduct espionage and sabotage, use force and violence to overthrow the government, engage in terrorist activity, or even who are believed likely to engage in any terrorist activity. Congress could not have better described the Government's allegations against al-Marri — *and* Congress decreed that individuals so described are *not* to be detained indefinitely but only for a limited

time, and by civilian authorities, prior to deportation or criminal prosecution.

In sum, Congress has carefully prescribed the process by which it wishes to permit detention of "terrorist aliens" within the United States, and has expressly prohibited the indefinite detention the President seeks here. The Government's argument that the President may indefinitely detain al-Marri is thus contrary to Congress's expressed will. "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). As the Supreme Court explained just last term, "[w]hether or not the President has independent power . . . he may not disregard limitations that Congress has, in proper exercise of its own war powers, placed on his powers." *Hamdan*, 126 S. Ct. at 2774 n.23 (*citing Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). In such cases, "Presidential claim[s]" to power "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring).

2.

In light of the Patriot Act, therefore, we must "scrutinize[ ] with caution," *id.*, the Executive's contention that the Constitution grants the President the power to capture and subject to indefinite military detention certain civilians lawfully residing within the United States. The Government nowhere suggests that the President's inherent constitutional power to detain does not extend to American citizens. Yet it grounds its argument that the President has constitutional power to detain al-Marri on his alien status. The Government apparently maintains that alien status eliminates the due process protection applicable to al-Marri, and for this reason permits the President to exercise special "peak" authority over him. The Government can so contend only by both ignoring the undisputed and relying on the inapposite.

It is undisputed that al-Marri had been legally admitted to the United States, attending an American university from which he had earlier received an undergraduate degree, and legally residing here

(with his family) for several months before the Government arrested him at his home in Peoria. The Government's refusal to acknowledge these undisputed facts dooms its contention that al-Marri's status as an alien somehow provides the President with special "peak" authority to deprive al-Marri of constitutional rights. For, as we have noted within, the Supreme Court has repeatedly and expressly held that aliens like al-Marri, i.e. those lawfully admitted into the United States who have "developed substantial connections with this country," are entitled to the Constitution's due process protections. *Verdugo-Urquidez*, 494 U.S. at 271; *see Kwong Hai Chew*, 344 U.S. at 596; *Wong Wing*, 163 U.S. at 238. No case suggests that the President, by fiat, can eliminate the due process rights of such an alien.

Without even a mention of these undisputed facts and controlling legal principles, the Government relies on two sorts of inapposite cases as assertedly establishing special presidential authority over aliens like al-Marri. The first of these, *Eisentrager*, 339 U.S. at 769 n.2, and *Ludecke*, 335 U.S. at 161-62, involves "enemy aliens." In those cases, the Supreme Court specifically defined "enemy aliens," but the Court did *not* define them as aliens who commit crimes against our country and so are enemies, as the Government seems to suggest. Rather, the Supreme Court defined "enemy aliens" as "subject[s] of a foreign state at war with the United States." *Eisentrager*, 339 U.S. at 769 n.2. Al-Marri plainly is *not* the "subject of a foreign state at war with the United States" and so is *not* an "enemy alien," but rather a citizen of Qatar, a country with which the United States has friendly relations. Thus *Eisentrager* and *Ludecke* provide no basis for asserting authority over al-Marri. In fact, elsewhere in its brief the Government concedes, as it must, that *Eisentrager* and *Ludecke* do not "have direct application" to al-Marri.

The other inapposite cases on which the Government relies involve *congressional* authority over aliens stemming from Congress's power over naturalization and immigration — not some special "inherent" constitutional authority enjoyed by the President over aliens. *See Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-91 (1952). These cases do not speak to the powers of the President acting alone — let alone contrary to an Act of Congress — and certainly do not suggest that the President has the

power to subject to indefinite military detention an alien lawfully residing in this country, like al-Marri.

In sum, al-Marri is not a subject of a country with which the United States is at war, and he did not illegally enter the United States nor is he alleged to have committed any other immigration violation. Rather, after lawfully entering the United States, al-Marri "developed substantial connections with this country," *Verdugo-Urquidez*, 494 U.S. at 271, and so his status as an alien neither eliminates due process rights, nor provides the President with extraordinary powers to subject al-Marri to seizure and indefinite detention by the military. The President's constitutional powers do not allow him to order the military to seize and detain indefinitely al-Marri without criminal process any more than they permit the President to order the military to seize and detain, without criminal process, other terrorists within the United States, like the Unabomber or the perpetrators of the Oklahoma City bombing.

3.

In light of al-Marri's due process rights under our Constitution and Congress's express prohibition in the Patriot Act on the indefinite detention of those civilians arrested as "terrorist aliens" within this country, we can only conclude that in the case at hand, the President claims power that far exceeds that granted him by the Constitution.[17]

We do not question the President's war-time authority over enemy combatants; but absent suspension of the writ of habeas corpus or declaration of martial law, the Constitution simply does not provide the President the power to exercise military authority over civilians within the United States. *See Toth*, 350 U.S. at 14 ("[A]ssertion of military authority over civilians cannot rest on the President's power as commander-in-chief, or on any theory of martial law."). The Presi-

---

[17]Because Congress has not empowered the President to subject civilian alien terrorists within the United States to indefinite military detention, *see supra* Part II, we need not, and do not, determine whether such a grant of authority would violate the Constitution. Rather, we simply hold that the Constitution does not provide the President acting alone with this authority.

dent cannot eliminate constitutional protections with the stroke of a pen by proclaiming a civilian, even a criminal civilian, an enemy combatant subject to indefinite military detention. Put simply, the Constitution does not allow the President to order the military to seize civilians residing within the United States and detain them indefinitely without criminal process, and this is so even if he calls them "enemy combatants."

A "well-established purpose of the Founders" was "to keep the military strictly within its proper sphere, subordinate to civil authority." *Reid*, 354 U.S. at 30. In the Declaration of Independence our forefathers lodged the complaint that the King of Great Britain had "affected to render the Military independent of and superior to the Civil power" and objected that the King had "depriv[ed] us in many cases, of the benefits of Trial by Jury." *The Declaration of Independence* paras. 14, 20 (U.S. 1776). A resolute conviction that civilian authority should govern the military animated the framing of the Constitution. As Alexander Hamilton, no foe of Executive power, observed, the President's Commander-in-Chief powers "amount to nothing more than the supreme command and direction of the military and naval forces." The Federalist No. 69, at 386 (Alexander Hamilton) (Clinton Rossiter ed., 1961). "That military powers of the Commander in Chief were not to supersede representative government of *internal affairs* seems obvious from the Constitution and from elementary American history." *Youngstown*, 343 U.S. at 644 (Jackson, J., concurring) (emphasis added). For this reason, the Supreme Court rejected the President's claim to "inherent power" to use the military even to seize property within the United States, despite the Government's argument that the refusal would "endanger the well-being and safety of the Nation." *Id.* at 584 (majority opinion).

Of course, this does not mean that the President lacks power to protect our national interests and defend our people, only that in doing so he must abide by the Constitution. We understand and do not in any way minimize the grave threat international terrorism poses to our country and our national security. But as *Milligan* teaches, "the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence." *Milligan*, 71 U.S. at 121. Those words resound as clearly in the twenty-first century as they did in the nineteenth.

Thus, the President plainly has plenary authority to deploy our military against terrorist enemies overseas. *See Curtiss-Wright*, 299 U.S. at 319-20; *see also Eisentrager*, 339 U.S. at 789. Similarly, the Government remains free to defend our country against terrorist enemies within, using all the considerable powers "the well-stocked statutory arsenal" of domestic law affords. *Hamdi*, 542 U.S. at 547 (Souter, J., concurring in the judgment) (citing numerous federal statutes criminalizing terrorist acts). Civilian law enforcement officers may always use deadly force whenever reasonable. *See Scott v. Harris*, 127 S. Ct. 1769, 1776-78 (2007). Furthermore, in the wake of September 11th, Congress has specifically authorized the President to deploy the armed forces at home to protect the country in the event of actual "terrorist attack[s] or incident[s]" within the United States meeting certain conditions. *See* 10 U.S.C.A. § 333(a)(A) (2007) (amending the Insurrection Act to provide the President with this authority, notwithstanding the Posse Comitatus Act, 18 U.S.C. § 1385).

But in this nation, military control cannot subsume the constitutional rights of civilians. Rather, the Supreme Court has repeatedly catalogued our country's "deeply rooted and ancient opposition . . . to the extension of military control over civilians." *Reid*, 354 U.S. at 33; *see also Laird v. Tatum*, 408 U.S. 1, 15 (1972) (Burger, C.J.) (recognizing "a traditional and strong resistance of Americans to any military intrusion into civilian affairs" that "has deep roots in our history and found early expression . . . in the constitutional provisions for civilian control of the military"). The Court has specifically cautioned against "break[ing] faith with this Nation's tradition" — "firmly embodied in the Constitution" — "of keeping military power subservient to civilian authority." *Reid*, 354 U.S. at 40. When the Court wrote these words in 1957, it explained that "[t]he country ha[d] remained true to that faith for almost one hundred seventy years." *Id.* Another half century has passed but the necessity of "remain[ing] true to that faith" remains as important today as it was at our founding.

The President has cautioned us that "[t]he war on terror we fight today is a generational struggle that will continue long after you and I have turned our duties over to others." Pres. George W. Bush, State of the Union Address (Jan. 23, 2007). Unlike detention for the duration of a traditional armed conflict between nations, detention for the length of a "war on terror" has no bounds. Justice O'Connor observed

in *Hamdi* that "[i]f the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war," the understanding that combatants can be detained "for the duration of the relevant conflict" "may unravel." 542 U.S. at 521. If the indefinite military detention of an actual combatant in this new type of conflict might cause the thread of our understandings to "unravel," the indefinite military detention of a civilian like al-Marri would shred those understandings apart.

In an address to Congress at the outset of the Civil War, President Lincoln defended his emergency suspension of the writ of habeas corpus to protect Union troops moving to defend the Capital. Lincoln famously asked: "[A]re all the laws, but one, to go unexecuted, and the government itself to go to pieces, lest that one be violated?" Abraham Lincoln, Message to Congress in Special Session (July 4, 1861), *in Abraham Lincoln: Speeches and Writings 1859-1865* at 246, 254 (Don E. Fehrenbacher ed., 1989). The authority the President seeks here turns Lincoln's formulation on its head. For the President does not acknowledge that the extraordinary power he seeks would result in the suspension of even one law and he does not contend that this power should be limited to dire emergencies that threaten the nation. Rather, he maintains that the authority to order the military to seize and detain certain civilians is an inherent power of the Presidency, which he and his successors may exercise as they please.

To sanction such presidential authority to order the military to seize and indefinitely detain civilians, even if the President calls them "enemy combatants," would have disastrous consequences for the Constitution — and the country. For a court to uphold a claim to such extraordinary power would do more than render lifeless the Suspension Clause, the Due Process Clause, and the rights to criminal process in the Fourth, Fifth, Sixth, and Eighth Amendments; it would effectively undermine all of the freedoms guaranteed by the Constitution. It is that power — were a court to recognize it — that could lead all our laws "to go unexecuted, and the government itself to go to pieces." We refuse to recognize a claim to power that would so alter the constitutional foundations of our Republic.

IV.

For the foregoing reasons, we reverse the judgment of the district court dismissing al-Marri's petition for a writ of habeas corpus. We

remand the case to that court with instructions to issue a writ of habeas corpus directing the Secretary of Defense to release al-Marri from military custody within a reasonable period of time to be set by the district court. The Government can transfer al-Marri to civilian authorities to face criminal charges, initiate deportation proceedings against him, hold him as a material witness in connection with grand jury proceedings, or detain him for a limited time pursuant to the Patriot Act. But military detention of al-Marri must cease.

*REVERSED AND REMANDED*

HUDSON, District Judge, dissenting:

I regret that I am unable to concur in the majority opinion, except to the extent that I agree that this Court has jurisdiction over this appeal. Although I do not embrace all aspects of the majority's jurisdictional reasoning, I agree that Section 7 of the Military Commission Act of 2006 (MCA) does not divest this Court of its constitutional jurisdiction, under Article I, Section 9, to review habeas corpus decisions involving individual detainees within the United States. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 525, 124 S. Ct. 2633, 2644 (2004). The MCA may, however, foreclose a right of statutory review. Beyond the jurisdictional question, the majority and I part company.

While I commend the majority on a thoroughly researched and impressively written opinion, I must conclude that their analysis flows from a faulty predicate. In my view, the appellant was properly designated as an enemy combatant by the President of the United States pursuant to the war powers vested in him by Articles I and II of the United States Constitution and by Congress under the Authorization to Use Military Force (AUMF). *See Hamdi v. Rumsfeld*, 296 F.3d 278, 281-82 (4th Cir. 2002).[1] I am also of the opinion that al-Marri

---

[1]In *Hamdi v. Rumsfeld*, the U.S. Supreme Court found that the AUMF provided congressional authority for the President to detain Hamdi as an enemy combatant under the narrow facts of that case. The critical elements of the court's definition of an "enemy combatant", for the purposes of that case, were the petitioner's being: 1) "part of a supporting force hostile to the United States or coalition partner", and (2) "engaged

has received all due process entitlements prescribed by existing United States Supreme Court precedent. I would therefore vote to affirm the district court's dismissal of al-Marri's Petition for Writ of Habeas Corpus.

The wellspring of the majority's reasoning is the notion that a non-military person arrested on U.S. soil, outside the zone of battle, for providing active aid to the enemy at time of war, cannot be declared an enemy combatant and detained for the duration of the hostilities, but must be prosecuted in the civilian courts of the United States. In fact, the majority would even go further and find that the language of the AUMF does not include organizations, such as al Qaeda, that are not affiliated with recognized nation states. The clear congressional intent underlying the AUMF was to afford the President of the United States all the powers necessary to suppress those individuals or organizations responsible for the terrorist attack on September 11, 2001. This broad language would certainly seem to embrace surreptitious al Qaeda agents operating within the continental United States. The AUMF provided as follows:

> [T]he President is authorized to use all necessary and appropriate force against those nations, *organizations, or persons* he determines planned, authorized, committed, or aided the

---

in an armed conflict against the United States." *Hamdi*, 542 U.S. at 526, 124 S. Ct. at 2645 (internal quotation marks omitted).

The boundaries of activity qualifying for "enemy combatant" status staked out in *Hamdi* were not meant to be immutable. The obvious impact of the limiting language was to confine the court's holding to the immediate facts before them.

While al-Marri was not captured while armed in a formal theater of war, the evidence would certainly support the conclusion that he was actively supporting forces hostile to the United States — and that the forces he was supporting were actively engaged in armed conflict against the United States.

Given the unconventional nature of the conflict that the United States is engaged in with al Qaeda, the exact definitions of "enemy combatants" and "enemy belligerents" are difficult to conceptualize and apply with precision.

terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001) (emphasis added). History has proven that al Qaeda, an international terrorist organization with which the United States is at war, falls squarely within that definition. *See Hamdi v. Rumsfeld*, 316 F.3d 450, 459 (4th Cir. 2003), vacated and remanded on other grounds, *Hamdi v. Rumsfeld*, 542 U.S. 507, 124 S. Ct. 2633 (2004).

Central to the majority's analysis is the locus of his arrest. Unlike the petitioners in *Hamdi v. Rumsfeld*, 542 U.S. 507, 124 S. Ct. 2633 (2004), and *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006), al-Marri is a lawful resident alien who was not taken into custody in a battle zone. He was arrested in Peoria, Illinois, where he was residing on a student visa. Despite powerful evidence of his connection to al Qaeda, the majority believe the President is without power to declare him an enemy combatant. They believe he must be indicted and tried for crimes against the United States. Although definitive precedent is admittedly sparse, in my opinion, this position is unsupported by the weight of persuasive authority.

In *Padilla v. Hanft*, 423 F.3d 386 (4th Cir. 2005), a panel of this Court unanimously rejected the argument that the locus of capture was relevant to the President's authority to detain an enemy combatant. *See id.* at 394. Padilla, a U.S. citizen, was arrested by FBI agents upon his arrival at O'Hare International Airport in Chicago, Illinois. *Id.* at 388. A close associate of al Qaeda, Padilla had been "armed and present in a combat zone during armed conflict between al Qaeda/Taliban forces and the armed forces of the United States." *Id.* at 390 (internal quotation marks omitted). Moreover, "Padilla met with Khalid Sheikh Mohammad, a senior al Qaeda operations planner, who directed Padilla to travel to the United States for the purpose of blowing up apartment buildings, in continued prosecution of al Qaeda's war of terror against the United States." *Id.*

This Court in *Padilla* reversed the holding of the district court that the President lacked authority under the AUMF to detain Padilla, and

that Padilla must be either criminally prosecuted or released. *Id.* With respect to Padilla's argument that the circumstances of his detention mandated only the option of criminal prosecution, this Court noted:

> . . . We are convinced, in any event, that the availability of criminal process cannot be determinative of the power to detain, if for no other reason than that criminal prosecution may well not achieve the very purpose for which detention is authorized in the first place—the prevention of return to the field of battle. Equally important, in many instances criminal prosecution would impede the Executive in its efforts to gather intelligence from the detainee and to restrict the detainee's communication with confederates so as to ensure that the detainee does not pose a continuing threat to national security even as he is confined—impediments that would render military detention not only an appropriate, but also the necessary, course of action to be taken in the interest of national security.

*Id.* at 394-95.

Military detention during time of war and criminal prosecution serve discrete functions. The object of criminal prosecution is to punish for legal transgression. The purpose of military detention is to immobilize the enemy during hostilities. *Hamdi*, 542 U.S. at 518, 124 S. Ct. at 2640. Such detention is also intended "to prevent the captured individual from serving the enemy." *In re Territo*, 156 F.2d 142, 145 (9th Cir. 1946).

The only significant fact that distinguishes the justification for Padilla's detention from that of al-Marri is that Padilla at some previous point in time had been armed and present in a combat zone. There was no indication, however, that Padilla was ever a soldier in a formal sense, particularly while acting on U.S. soil.

Like Padilla, al-Marri, an identified al Qaeda associate, was dispatched to the United States by the September mastermind as a "sleeper agent" and to explore computer hacking methods to disrupt the United States' financial system. Moreover, al-Marri volunteered for a martyr mission on behalf of al Qaeda, received funding from a

known terrorist financier, and communicated with known terrorists by phone and e-mail. Decl. of Jeffrey N. Rapp, Director, Joint Intelligence Task Force for Combating Terrorism, ¶ 7, Sept. 9, 2004. It is also interesting to note that al-Marri arrived in the United States on September 10, 2001. *Id.*

The district court in this case credited the Declaration of Rapp, which was unrebutted, and found by a preponderance of the evidence, that al-Marri had been properly classified and detained as an enemy combatant. *See Al-Marri v. Wright*, 443 F. Supp. 2d 774, 784 (D.S.C. 2006).[2]

The standard employed by the district court to determine al-Marri's qualifications for enemy combatant status was analogous to that invoked by the United States Supreme Court in *Ex Parte Quirin*, 317 U.S. 1, 63 S. Ct. 2 (1942). In *Quirin*, the Court explained,

> [E]ntry upon our territory in time of war by enemy belligerents, including those acting under the direction of the armed forces of the enemy for the purpose of destroying property used or useful in prosecuting the war, is a hostile and war-like act. . . .
>
> . . . .
>
> . . . Citizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts are enemy belligerents within the meaning of . . . the law of war. . . .

*Id.* at 36-38. The *Quirin* Court further provided that "[i]t is without significance that petitioners were not alleged to have borne conventional weapons or that their proposed hostile acts did not necessarily contemplate collision with the Armed Forces of the United States." *Id.* at 37. "Nor are petitioners any the less belligerents if, as they

---

[2]Al-Marri not only failed to offer any evidence on his behalf, he refused to even participate in the initial evidentiary process. *Al-Marri*, 443 F. Supp. 2d at 785.

argue, they have not actually committed or attempted to commit any act of depredation or entered the theatre or zone of active military operations." *Id.* at 38.

*Ex Parte Milligan*, 71 U.S. 2 (1866), does not undermine the district court's decision. Milligan did not associate himself with a rebellious State with which the United States was at war. *See Milligan*, 71 U.S. at 131; *Quirin*, 317 U.S. at 45, 63 S. Ct. at 19 (noting that the Court in *Milligan* "concluded that Milligan [was] not . . . a part of or associated with the armed forces of the enemy"). In this case, the unrebutted evidence shows that al-Marri associated himself with and became an agent of al Qaeda, the organization targeted by the AUMF and the enemy with which the United States is at war. *See Rapp Decl.* ¶ 7 ("Al-Marri is an al Qaeda 'sleeper agent' . . . was trained at an al Qaeda terror camp . . . met personally with Usama Bin Laden . . . and volunteered for a martyr mission.").[3] As noted above, it is without significance that al Marri did not himself carry a conventional weapon in a zone of active military operations. *See Quirin*, 317 U.S. at 37-38.

In *Hamdi*, the Supreme Court considered the due process requirements for a citizen being held in the United States as an enemy combatant. *See Hamdi*, 542 U.S. at 509, 124 S. Ct. at 2635. Hamdi was an American citizen captured in Afghanistan for allegedly taking up arms with the Taliban in a combat zone. *Id.* at 510, 124 S. Ct. at 2635. Like al-Marri, Hamdi was being detained at the Naval Brig in Charleston, South Carolina. *Id.* at 510, 124 S. Ct. 2636. After applying a balancing of interest calculus, the Court observed, "a citizen-

---

[3]Just as mere presence is not sufficient to make one a part of a criminal conspiracy or an accomplice to a crime, I agree with the majority that mere association with al Qaeda or an organization that supports al Qaeda does not necessarily make one an enemy combatant. *See Milligan*, 71 U.S. at 131 (stating that "[i]f in Indiana [Milligan] conspired with bad men to assist the enemy, he is punishable for it in the courts of Indiana"). This is not a case, however, of mere association. Al-Marri trained with and became an agent of al Qaeda and, operating under its guidance and direction, entered the United States on September 10, 2001, "for the purpose of engaging in and facilitating terrorist activities subsequent to September 11," the very activities that the AUMF was intended to prevent. Rapp Decl. ¶ 7; *see* AUMF § 2(a).

detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Hamdi*, 542 U.S. at 533, 124 S. Ct. at 2648. "It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner." *Id.* at 533, 124 S. Ct. at 2649 (internal quotation marks omitted).

After upholding the power of the President to detain al-Marri under the AUMF, the district court, after providing him with all due process entitlements articulated in *Hamdi*, found that his continued detention as an enemy combatant was proper and dismissed his petition. *See Al-Marri*, 443 F. Supp. 2d at 785. In addition, al-Marri was represented by counsel at all stages of the proceedings below.

I believe the district court correctly concluded that the President had the authority to detain al-Marri as an enemy combatant or belligerent. Although al-Marri was not personally engaged in armed conflict with U.S. forces, he is the type of stealth warrior used by al Qaeda to perpetrate terrorist acts against the United States. Al-Marri's detention is authorized under the AUMF "to prevent any future acts of international terrorism against the United States." AUMF § 2(a). Furthermore, setting aside the amorphous distinction between an "enemy combatant" and an "enemy belligerent," there is little doubt from the evidence that al-Marri was present in the United States to aid and further the hostile and subversive activities of the organization responsible for the terrorist attacks that occurred on September 11, 2001.

I therefore vote to affirm the district court.